**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------- x
                                       :

In re:                                  :         **Chapter 15**
                                         :

**THE CANNABIST COMPANY**      :         **Case No. 26–** **_____** **([●])**
**HOLDINGS INC.,** *et al.,*            :
                                          :

      **Debtors in a Foreign Proceeding.**[1]    :        **(Joint Administration Requested)**
                                          :

----------------------------------------------------------- x

**MOTION FOR RECOGNITION OF FOREIGN**
**PROCEEDING AND REQUEST FOR CERTAIN RELATED RELIEF**

The Cannabist Company Holdings Inc. (the "**Parent Company**"), in its capacity as the duly-appointed foreign representative (the "**Foreign Representative**") of the Parent Company and its debtor affiliate, The Cannabist Company Holdings (Canada) Inc. ("**The Cannabist Canada Company**," and together with the Parent Company, the "**Debtors**"), which are the subject of a proceeding (the "**Canadian Proceeding**") currently pending in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") and initiated pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended, the "**CCAA**"), has commenced the above-captioned chapter 15 cases (the "**Chapter 15 Cases**") ancillary to the Canadian Proceeding and respectfully represents as follows in support of this motion (together with each of the Debtors' *Voluntary Chapter 15 Petition* (the "**Chapter 15 Petitions**") filed contemporaneously herewith, the "**Verified Petitions**"):

---

[1]     The Debtors in the Chapter 15 Cases, together with the last four digits of their federal tax identification number or Canadian business number, as applicable, are: (i) The Cannabist Company Holdings Inc. (8978) and (ii) The Cannabist Company Holdings (Canada) Inc. (9428).  The location of the Parent Company's registered office and the Debtors' service address is: 666 Burrard St #1700, Vancouver, British Columbia V6C 2X8, Canada. Additional information may be obtained on the website of the Debtors' information agent at https://www.veritaglobal.net/CCGroup.

**PRELIMINARY STATEMENT[2]**

1.      The Parent Company is a Canadian holding company, publicly traded on the Cboe Canada Inc. stock exchange in Toronto, Ontario, and an issuer of approximately $180 million of outstanding Canadian-law-governed secured debt.  It is the parent of its affiliated Debtor, The Cannabist Canada Company, and the ultimate parent of non-Debtor subsidiaries (the "**Subsidiaries**," and each, a "**Subsidiary**," and collectively with the Debtors, the "**CC Group**").  The Debtors are co-issuers of the CC Group's funded debt.  Certain other non-Debtor Subsidiaries in the CC Group are guarantors of that debt.  The CC Group's non-Debtor Subsidiaries operate a vertically-integrated cannabis cultivation, manufacturing, and retail business in eight U.S. states where medical or adult-use cannabis is legal under state law.

2.      The CC Group has faced significant headwinds in recent years, including, competitive pressures, supply-chain challenges, and challenges gaining access to capital markets. As a result, prior to the commencement of these cases, the CC Group commenced a sales process designed to maximize value for the CC Group's stakeholders and subsequently wind-down its remaining operations (the "**Sale Process**" and the sales in connection therewith, the "**Sales**").

3.      On March 24, 2026, the Debtors commenced the Canadian Proceeding to complete the remaining Sales under the protection of the CCAA.  On the same day, the Canadian Court granted the Debtors protection under an initial order (as amended, supplemented, extended, restated, or otherwise modified from time to time, the "**Initial Order**").

4.      The Debtors intend to file a CCAA Plan of Compromise and Arrangement (a "**CCAA Plan**"), which will provide for the distribution of proceeds from Sales consummated during the Canadian Proceeding and a liquidation of the remaining assets of the CC Group.  A

---

[2]    Capitalized terms used in this Preliminary Statement shall have the meaning assigned to such terms below.

RLF1 35570994v.1

majority of the Debtors' Senior Noteholders (as defined below) support this value-maximizing process and signed a support agreement (the "**Support Agreement**") prior to the commencement of the Canadian Proceeding in respect of this process.

5.      By this motion, the Debtors seek recognition of the Canadian Proceeding and enforcement of the Initial Order, which is imperative to the success of the CC Group's Sale Process and wind-down through the Canadian Proceeding.  As set forth in detail below, the Initial Order provides for a stay protecting the CC Group.  The CC Group has assets, operations, and contract counterparties in the United States.  Recognition of the Canadian Proceeding and enforcement of the Initial Order in the U.S. are vital to the success of the value-maximizing Sale Process and orderly wind-down.  In the absence of recognition and enforcement of the Initial Order, the value of the Debtors' assets in the United States (i.e., their cash and the equity interests in the Subsidiaries) may be jeopardized as the CC Group's creditors and other parties in interest may be motivated to "race to the courthouse" to obtain and enforce judgments or otherwise exercise self-help remedies against the CC Group and its assets in the United States.  Such actions would be value-destructive and frustrate the Canadian Proceeding.  Beyond financial harm to the Debtors and their creditors, business disruption poses a risk to the approximately 100,000 patients that rely on the CC Group for access to medicinal products and to the CC Group's 1,200 employees.  Accordingly, the relief requested by the Foreign Representative is necessary to ensure that the Canadian Proceeding and the Chapter 15 Cases will be conducted in a fair, efficient, and centralized manner that will allow the Debtors to complete the Sales and wind down their estates.

## RELIEF REQUESTED

6.      By this motion, the Foreign Representative requests entry of the proposed order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**") pursuant to

sections 105(a), 362, 363, 364, 365, 549, 552, 1504, 1507, 1510, 1515, 1517, 1520, 1521, and 1522 of title 11 of the United States Code (the "**Bankruptcy Code**"):

(i)    recognizing the Canadian Proceeding as a "foreign main proceeding" pursuant to section 1517(b)(1) of the Bankruptcy Code, or in the alternative as a "foreign nonmain proceeding," pursuant to section 1517(b)(2) of the Bankruptcy Code;

(ii)    recognizing the Foreign Representative as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code, in respect of the Canadian Proceeding;

(iii)    giving full force and effect in the United States to the Initial Order, including any extensions thereof or amendments thereto authorized by the Canadian Court and extending the protections of the Initial Order to the Debtors on a final basis;

(iv)    granting the Debtors all the relief afforded pursuant to section 1520 of the Bankruptcy Code, including the "automatic stay" under section 362 of the Bankruptcy Code, which shall apply with respect to the Debtors and the Stay Parties[3] and the Debtors' and the Stay Parties' property that is now or in the future located within the territorial jurisdiction of the United States;

(v)    extending on a final basis, pursuant to section 1521(a)(6) of the Bankruptcy Code, the relief granted under the Provisional Relief Order (as defined below) and granting such further additional relief requested herein and as otherwise authorized by sections 1507 and 1521 of the Bankruptcy Code, as applicable, as the Court deems necessary;

(vi)    enjoining parties from taking any action in the United States that is otherwise inconsistent with the Canadian Proceeding or Initial Order;

(vii)    authorizing the Debtors to incur no further expenses in relation to any filings, disclosures, core or non-core documents, restatements, amendments to existing filings, press releases or any other actions that may be required by any federal, state, or other law respecting securities or capital markets in Canada or the United States, including the United States Securities Exchange Commission, or by the rules and regulations of a stock exchange, including the *Securities Act* (Ontario), comparable statutes enacted by other provinces of Canada, comparable statutes enacted by the United States or any state, and other rules, regulations, and policies of such stock exchanges; and

---

[3]    "**Stay Parties**" means the Debtors and the other parties pursuant to which the stay in the Initial Order applies, as set forth in the Initial Order at ¶¶ 13 to 20, 26.

RLF1 35570994v.1

(viii)    granting such other relief as the Court deems just and proper.

7.    In support of this motion, the Foreign Representative relies upon the (i) *Declaration of Curt Kroll in Support of Debtors' Motions for (I) Provisional Relief and (II) Recognition of Foreign Proceeding and Certain Related Relief* (the "**CRO Declaration**") and (ii) *Declaration of Lee Nicholson as Canadian Counsel to the Debtors in Support of Debtors' Motions for (I) Provisional Relief and (II) Recognition of Foreign Proceeding and Certain Related Relief* (the "**Nicholson Declaration**," and together with the CRO Declaration, the "**Supporting Declarations**"),[4] each filed contemporaneously herewith and incorporated herein by reference.

## JURISDICTION AND VENUE

8.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Foreign Representative properly commenced the Chapter 15 Cases pursuant to sections 1504 and 1509 of the Bankruptcy Code by filing petitions for recognition of the Canadian Proceeding pursuant to section 1515 of the Bankruptcy Code.

9.    This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Foreign Representative consents to the entry of a final order by the Court in connection with this motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

---

[4]    Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Supporting Declarations.

10.    Venue is proper before the Court pursuant to 28 U.S.C. § 1410, as the Debtors have assets in the United States located in Delaware.

## BACKGROUND

### I.    Industry Overview

11.    The CC Group operates in an industry that has experienced rapid growth in the United States in recent years following the enactment of state legislation enabling the commercial cultivation and sale of cannabis for either medical or adult use.

12.    In 2024, the state-legal market for medical or adult-use cannabis in the United States represented an approximately $31 billion dollar market and provided more than 440,000 full-time equivalent jobs.[5]   At present, the growth, distribution, and use of medical cannabis is permitted by law in 47 states and the District of Columbia.  Moreover, 24 states and the District of Columbia permit the recreational use of cannabis by law.[6]

13.    On December 18, 2025, the President of the United States issued an Executive Order (the "**Executive Order**") directing the Attorney General of the United States to take all necessary steps to complete the rescheduling of cannabis from Schedule I to Schedule III under the Controlled Substances Act (21 U.S.C. § 801) (the "**CSA**").[7]   Once implemented, the rescheduling will remove any potential for application of Section 280E of the Internal Revenue Code ("**Section 280E**"), which the Internal Revenue Service ("**IRS**") has asserted requires cannabis industry participants to pay taxes on gross revenue rather than gross profits, and which has hindered the financial health of the legal cannabis industry to date.

---

[5]    Beau Whitney, *U.S. Cannabis Jobs Report 2025: The State of Cannabis Jobs—Challenges, Changes, and Optimism for the Future* (Vangst 2025).

[6]    CDC (Centers for Disease Control and Prevention), *State Medical Cannabis Laws*, Feb. 16, 2024, https://www.cdc.gov/cannabis/about/state-medical-cannabis-laws.html.

[7]    Exec. Order No. 14370, 90 Fed. Reg. 60541 (Dec. 18, 2025).

RLF1 35570994v.1

## II.    CC Group's Business and Corporate Structure

14.    The Parent Company is a holding company that directly and indirectly owns the Subsidiaries, including its Debtor-affiliate, The Cannabist Canada Company.  An illustrative chart summarizing the Debtors' organizational structure is below, and a more detailed chart of the CC Group's organizational structure is attached to the CRO Declaration as Exhibit A.



*a.  Debtors*

15.    The Parent Company is incorporated under the *Business Corporations Act* (British Columbia), maintains a registered and records office address in Vancouver, British Columbia, and has its common shares publicly listed under the ticker symbol "CBST" on the CBOE, a Canadian stock exchange based in Toronto, Ontario.  Common shares of the Parent Company also trade under the ticker symbol "CBSTF" on the OTCQB, an over-the-counter stock exchange operated by the OTC Markets Group in the United States.

16.    Between 2019 and 2024, the Parent Company raised through Canadian agents approximately $340 million CAD through the issuance of common stock and $320 million

RLF1 35570994v.1

in secured debt from the Canadian capital markets.  The designated market maker for the Parent Company was RBC Dominion Securities Inc., and its transfer agent and trustee of the A&R Indenture is Odyssey Trust Company, having its principal offices in Vancouver, British Columbia. The Parent Company is a co-issuer of the Senior Notes (as defined below).

17.    The Cannabist Canada Company was incorporated under the *Business Corporations Act* (Ontario), and its registered office is located in Toronto, Ontario.  It is co-issuer of the Senior Notes.

b.    *Subsidiaries*

18.    The Parent Company oversees the CC Group's Subsidiaries.  Certain of the Subsidiaries are intermediate holding companies, which own the equity of other Subsidiaries, or operating companies, which conduct management and administrative functions for the CC Group (the "**Non-Cannabis Subsidiaries**").  Certain of the Parent Company's indirect Subsidiaries operate cannabis businesses in markets where medical or adult-use cannabis is legally permitted under state law (the "**Cannabis Subsidiaries**").  The Non-Cannabis Subsidiaries do not produce, sell, otherwise handle cannabis, or hold licenses for production, sale, or handling of cannabis.

19.    The CC Group's Cannabis Subsidiaries hold licenses from relevant state authorities and produce, sell, and/or handle cannabis in their day-to-day operations in accordance with licenses, applicable laws, and regulations.  The Cannabis Subsidiaries are not Debtors in the Chapter 15 Cases.  Equity and assets of certain of these entities are being sold as part of the Sales, and others are being wound down.[8]

---

[8]    CRO Declaration ¶ 15.

*c. Net losses*

20.     The CC Group incurred net losses of $105.1 million for the 12 months ended December 31, 2024 and $124.2 million of net losses for the nine months ended September 30, 2025.[9]

## III.    Debtors' Insolvency Proceedings

21.     On March 24, 2026 (the "**CCAA Commencement Date**"), the Debtors applied for protection in the Canadian Court pursuant to the CCAA.  On the same day, protection was granted under the Initial Order.  The Initial Order appointed FTI Consulting Canada Inc. ("**FTI Canada**") as the monitor of the Debtors in the Canadian Proceeding (the "**Monitor**").   A description of the relief provided in the Initial Order is set forth below.

22.     Contemporaneously herewith, the Foreign Representative filed the *Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code*, which seeks entry of an order granting certain provisional relief in the Chapter 15 Cases (the "**Provisional Relief Order**").

23.     The Foreign Representative anticipates that the Canadian Court will enter an amended and restated Initial Order (the "**Amended and Restated Initial Order**") on or around April 2, 2026.

---

[9]     The Cannabist Co. Holdings Inc., Quarterly Report (Form 10-Q) (Nov. 10, 2025), at 4; The Cannabist Co. Holdings Inc., Annual Report (Form 10-K) (Mar. 17, 2025), at F-5.

RLF1 35570994v.1

**IV.     CC Group's Capital Structure**

24.     As of the CCAA Commencement Date, the CC Group's capital structure includes approximately $220 million in funded debt, summarized below.

a.  *Debt Obligations*

**1.     Senior Notes**

25.     The CC Group's secured indebtedness consists primarily of the principal amount of approximately $179 million of senior notes (the "**Senior Notes**") issued pursuant to that certain *Amended and Restated Trust Indenture*, dated May 29, 2025 (as amended, supplemented, and otherwise modified from time to time, the "**A&R Indenture**"), entered into between the Parent Company and The Cannabist Canada Company, as co-issuers, and Odyssey Trust Company, acting as trustee on behalf of the holders of Senior Notes (the "**Senior Noteholders**"). Certain of the Subsidiaries are guarantors of the Senior Notes.  The Senior Noteholders have at all times been secured by substantially all the assets of the CC Group since the Senior Notes were issued.  The A&R Indenture is governed by the laws of British Columbia and three of the five largest Senior Noteholders, holding approximately 37% of the debt, are domiciled in Canada.

26.     The Senior Notes mature on December 31, 2028.  Pursuant to the A&R Indenture, interest on the Senior Notes is payable semi-annually in arrears on June 30 and December 31 of each year.  On December 31, 2025, due to liquidity constraints, the CC Group elected not to make the interest payment due on such date.  The failure to make an interest payment was subject to a 30-day grace period and became an event of default under the A&R Indenture on January 30, 2026 (the "**Specified Default**").

27.     On January 29, 2026, the CC Group entered into a forbearance agreement with a majority of the Senior Noteholders (the "**Forbearing Noteholders**"), pursuant to which the Forbearing Noteholders agreed to forbear from exercising any rights and remedies with respect to

10

the Specified Default until February 17, 2026 (subject to certain other terms and conditions). On February 17, 2026, the CC Group and the Forbearing Noteholders agreed to extend the forbearance period through February 20, 2026. On February 20, 2026, the CC Group and the Forbearing Noteholders agreed to a further extension of the forbearance until February 27, 2026. On February 27, 2026, the CC Group and the Forbearing Noteholders agreed to a further extension of the forbearance until March 6, 2026. On March 6, 2026, the CC Group and the Forbearing Noteholders agreed to a further extension of the forbearance until March 17, 2026. On March 17, 2026, the CC Group and the Forbearing Noteholders agreed to a further extension of the forbearance until March 25, 2026.

### 2.      Mortgage Debt

28.      Three non-Debtor Subsidiaries are indebted to East West Bank in the aggregate amount of approximately $40.4 million pursuant to three separate loan agreements. Each loan agreement is secured by a mortgage over separate real property, and each is guaranteed by the Parent Company.

#### b.  Unsecured Obligations

29.      In addition to ordinary course vendors and other commercial obligations, the CC Group's unsecured obligations include liabilities in connection with lease obligations, disputed federal tax liabilities, and contingent liabilities associated with ongoing litigation.

### 1.      Lease Liabilities

30.      The CC Group has leases in various states. The leases are between various landlords, and Subsidiary entities within the CC Group, as tenants. The Parent Company guarantees 13 of these leases.

11

RLF1 35570994v.1

### 2. Disputed Tax Liabilities

31. Certain entities within the CC Group that are classified as corporations for U.S. federal income tax purposes file a consolidated U.S. federal income tax return with the Parent Company as part of a consolidated tax group (the "**Tax Group**"). Under Treasury Regulation section 1.1502-6, each member of the Tax Group is independently liable for the entire U.S. federal income tax liabilities of the Tax Group incurred during taxable years in which such members were part of the Tax Group.[10]

32. The IRS has taken the position that Section 280E prevents the Parent Company from taking deductions or credits for any amount paid or incurred during the taxable year in carrying on its cannabis business (or the activities that comprise such business). *See* 28 U.S.C. § 280E. The IRS's enforcement of Section 280E with respect to the Parent Company has resulted in the IRS asserting federal income tax claims in the approximate amount of $51 million for the 2022 and 2023 tax years.[11] The applicability of Section 280E to the state-legal cannabis industry is currently disputed by numerous publicly-listed multi-state operators ("**MSOs**") in the state-legal cannabis industry. Many MSOs, including the Parent Company, have taken the position that Section 280E does not apply to their businesses and have filed amended tax returns seeking refunds for overpaid amounts.[12] The Parent Company has filed certain of its

---

[10] Treas. Reg. § 1.502-6.

[11] As of the date hereof, the IRS has not communicated any asserted tax liabilities of the Company for the 2024 and 2025 tax years.

[12] *See, e.g.*, Trulieve Cannabis Corp.*, Trulieve Announces Filing of Amended Federal Tax Returns Claiming $143 Million Refund,* Ex. 99.1 to Form 8-K, (Oct. 13, 2023); Ascend Wellness Holdings, Inc., *Annual Report (Form 10-K)* 43–44 (Dec. 31, 2023); TerrAscend Corp.*,* Annual Report (Form 10-K) 27–28 (Dec. 31, 2023), filed Mar. 14, 2024; Curaleaf Holdings, Inc., *Q2 2024 Financial Statements & MD&A (Interim) (Ex. 99.2 to Q2 2024 Filing)* (June 30, 2024); Cresco Labs Inc., *Unaudited Condensed Interim Consolidated Financial Statements (Q2 2024)* 34 (Aug. 8, 2024).

RLF1 35570994v.1

original U.S. federal and state income tax returns and amended certain of its previously filed U.S. federal and state income tax returns on this basis.

33.    The Parent Company and other MSOs find support for their interpretation in a plain reading of Section 280E, which applies only to substances "prohibited" by federal or state law.  But both federal and state governments have permitted the state-legal cannabis industry to operate without enforcement under the CSA.  Further, the Department of Health and Human Services, which is tasked with providing the Attorney General guidance and recommendations during the rulemaking process about rescheduling drugs, recommends rescheduling cannabis as a Schedule III drug.  *See* Letter from U.S. Dep't of Health & Hum. Servs. to U.S. Drug Enf. Admin., *Basis for the Recommendation to Reschedule Marijuana into Schedule III of the Controlled Substances Act* (Aug. 29, 2023) (the "**HHS Recommendation**").  The HHS Recommendation suggests that cannabis is not, and has not been for years, "within the meaning of schedule I and II of the Controlled Substances Act" as Section 280E requires.[13]  In support of its findings, the HHS Recommendation relied on extensive, years-long research supporting that cannabis has a "Currently Accepted Medical Use in Treatment" (as defined in the CSA) and is not at risk of abuse consistent with Schedule I or Schedule II of the CSA.

34.    In September 2024, the IRS demanded payment from the Parent Company for its asserted federal income tax liability related to the 2022 tax year (the "**2022 Asserted Tax Debt**").  In November 2024, the IRS demanded payment from the Parent Company for asserted tax liabilities with respect to the 2023 tax year (the "**2023 Asserted Tax Debt**," and together with the 2022 Asserted Tax Debt, the "**22–23 Asserted Tax Debt**") and, in connection with these demands, the IRS filed a federal tax lien on the Parent Company's assets.  Subsequently, the Parent

---

[13]    HHS Recommendation, at 63–64.

13

Company and the IRS agreed to a payment plan pursuant to which the Parent Company would pay the IRS $500,000 per month in relation to the 22–23 Asserted Tax Debt (the "**IRS Payment Plan**").  Under the IRS Payment Plan, the IRS agreed to release its lien and the Parent Company agreed to pay the IRS $500,000 per month until the 22–23 Asserted Tax Debt is paid in full.  Prior to the filing, the Parent Company had been making payments in accordance with the IRS Payment Plan.[14]  If the Parent Company does not make the payment each month, absent relief from this Court there is risk that the IRS exercises remedies, including levying the Parent Company or other members of the Tax Group's bank accounts to garnish them.

35.     As set forth above, on December 18, 2025, the President of the United States issued the Executive Order, directing the Attorney General of the United States to take all necessary steps to complete the rescheduling of cannabis from Schedule I to Schedule III under the CSA.[15]  Once the federal rulemaking process is complete and cannabis is rescheduled, the IRS's asserted position on Section 280E (which, as set forth above, the CC Group disputes) should no longer apply to the CC Group, and the Parent Company would be able to take deductions or credits for its business expenses and also may be entitled to a refund in connection with past application of Section 280E.

## V.     Events Leading to Canadian Proceeding and Chapter 15 Cases

36.     In response to the challenges faced by the CC Group, beginning in 2023, the CC Group undertook a series of operational restructuring initiatives, including the divestitures of underperforming assets, the streamlining and reorganization of various business lines, reductions in overall headcount, implementation of cost-containment measures, and improvements

---

[14]   As a disputed pre-filing obligation, the Parent Company does not intend to make payments on account of such amounts following commencement of the Canadian Proceeding.

[15]   *See* Exec. Order No. 14370, 90 Fed. Reg. 60541 (Dec. 18, 2025).

RLF1 35570994v.1

to operational efficiencies.   The CC Group also pursued multiple capital-raising initiatives, including equity and debt financings, and has conducted multiple strategic review processes with the assistance of its financial and legal advisors.

### a. CBCA Restructuring Transaction

37.     Prior to entry into the A&R Indenture in 2025, the CC Group's secured indebtedness consisted primarily of $270 million of senior notes: (a) senior notes in the amount of $59.5 million principal maturing on June 29, 2025 (the "**2025 Notes**"); (b) senior notes in the amount of $185.5 million principal maturing on February 3, 2026 (the "**2026 Notes**"); and (c) senior notes in the amount of $25.5 million principal maturing on March 19, 2027.

38.     In or around October 2024, facing the maturity of the 2025 Notes and maturity of the 2026 Notes within 12 months, the CC Group explored options to extend its runway. After extensive negotiations that culminated in a support agreement with an ad hoc group of senior noteholders in respect of the Canadian-law governed senior notes, the CC Group commenced proceedings in the Canadian Court to extend the maturity of its senior debt to December 31, 2028, through the issuance of the Senior Notes in exchange for its then-outstanding senior notes (the "**CBCA Restructuring Transaction**").

### b. Sale Process

39.     Following the CBCA Restructuring Transaction, in June 2025, the CC Group commenced the Sale Process with the assistance of Moelis & Company LLC ("**Moelis**") to seek the value-maximizing transactions for the CC Group and its stakeholders through a sale of the CC Group or multiple sales of certain strategic markets.  The Parent Company subsequently formed a special committee composed of independent directors of its board of directors (the "**Board**") to oversee the Sale Process and to make recommendations regarding the ultimate

path forward for the CC Group. In addition to the larger Sale Process, the Parent Company continued an already-ongoing sale process with respect to the CC Group's California operations (the "**California Process**").

40. Moelis led a rigorous Sale Process involving 29 potential bidders. The Sale Process and the California Process has resulted thus far in three closed sales transactions (the "**Closed Transactions**") and two signed sale transactions (the "**Signed Transactions**"), summarized below.

### Closed Transactions

- **CA Mission Bay Sale**. On January 30, 2026, certain members of the CC Group closed an equity sale of former Subsidiary Mission Bay LLC for approximately $1 million.

- **Virginia Sale**. On February 5, 2026, certain members of the CC Group closed a sale for the equity of former Subsidiary Green Leaf Medical of Virginia, LLC in the Virginia market for approximately $130 million (the "**Virginia Sale**").

- **CA Focused Health Sale**. In March 2026, certain members of the CC Group closed a sale for the equity of former Subsidiary Focused Health, LLC.

### Signed Transactions

- **Delaware Sale**. On March 23, 2026, certain members of the CC Group entered into an agreement for the sale of certain assets of Columbia Care Delaware, LLC, in the Delaware market for approximately $16.5 million (the "**Delaware Sale**").

- **Ohio Sale**. On March 23, 2026, certain members of the CC Group entered into an agreement for the sale of the equity of six CC Group's Subsidiaries in the Ohio market for approximately $47 million (the "**Ohio Sale**").

41. In addition, prior to the CCAA Commencement Date, the Parent Company entered a non-binding memorandum of understanding with respect to the sale of its businesses in the Colorado, Illinois, Maryland, Massachusetts, New Jersey, and West Virginia markets, which the CC Group expects to develop into multiple binding purchase agreements in the coming weeks.

The CC Group has substantially completed winding down its New York operations and is in the process of winding down its Pennsylvania operations.

    *c. Senior Noteholder Consent and Support Agreement*

42. Throughout the Sale Process, the CC Group has engaged and consulted with Senior Noteholders to work collaboratively towards a value-maximizing sale and wind-down process for the benefit of all stakeholders.

43. In connection with the commencement of the Canadian Proceeding, the Debtors entered into the Support Agreement with members of an ad hoc group of the Senior Noteholders that collectively hold approximately 60% of the Senior Notes (the "**Supporting Noteholders**"). The Support Agreement is governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein. The Support Agreement memorializes the Supporting Noteholders' support for the process to be implemented through the Canadian Proceeding and recognized in the Chapter 15 Cases, including effectuating the Sales and winding down the Debtors' estates through a subsequently filed CCAA Plan of Compromise and Arrangement.

44. The CCAA Plan will provide an efficient mechanism to distribute remaining cash and any non-cash consideration to creditors, as well as effectuate an orderly wind-down of the Debtors' estates.

45. Absent the CC Group's constructive engagement with Senior Noteholders to obtain their support for the Sales and wind-down efforts, the Debtors and the rest of the CC Group likely would have run out of liquidity, defaulted under the A&R Indenture without the ability to obtain a forbearance, and been forced into a value-destructive foreclosure or liquidation process. Instead, the CC Group has found going concern buyers for the vast majority of its

17

operating assets at attractive values and the Debtors now seek relief under the CCAA and the Bankruptcy Code to protect this value-maximizing outcome for its stakeholders and provide for an orderly wind-down.

## VI.   Canadian Proceeding

46.   On March 24, 2026, the Canadian Court entered the Initial Order in the Canadian Proceeding, granting certain relief in connection with the Canadian Proceeding, including (among other things):

(a)   recognizing that the Debtors are companies to which the CCAA applies;

(b)   appointing FTI Canada to act as the Monitor of the Debtors in the Canadian Proceeding;

(c)   granting the Monitor full and complete access to the Debtors' property, including their premises, books, records, electronic data, and other financial documents;

(d)   ordering a stay of proceedings, for an initial period of ten days in accordance with the CCAA, to protect the Stay Parties;

(e)   ordering the Debtors to indemnify their directors and officers against obligations and liabilities incurred after commencement of the proceedings, except to the extent that the obligation or liability was a result of the director's or officer's gross negligence or willful misconduct;

(f)   authorizing a charge on the Debtors' assets as security for the indemnity provided to the Debtors' directors and officers;

(g)   authorizing a charge on the Debtors' assets as security for the professional fees and disbursements of the Debtors' counsel, the Monitor, and the Monitor's counsel;

(h)   approving the Parent Company to act as the foreign representative of the Debtors; and

(i)   authorizing the Foreign Representative to apply for foreign recognition and approval of the Canadian Proceeding and to seek related relief, as necessary, including, in this Court pursuant to chapter 15 of title 11 of the Bankruptcy Code.

18

47.     The Debtors are also seeking approval of an Amended and Restated Initial Order in the Canadian Proceeding certain additional relief including (among other things):

(a)     approval of SierraConstellation Partners LLC's appointment as Chief Restructuring Officer;

(b)     approval of a key employee retention plan;

(c)     approval of the engagements of Moelis as financial advisor to the Debtors, and Ducera Partners LLC as financial advisor to the Supporting Noteholders;

(d)     approving the execution of the Support Agreement by the Debtors and authorizing and directing the Debtors to take all steps and actions in respect of, and to comply with their obligations under, the Support Agreement; and

(e)     relief from certain reporting obligations that may be required by any federal, state, provincial, or other law with respect to securities or capital markets in Canada or the United States.

48.     The Foreign Representative anticipates the Canadian Court will enter the Amended and Restated Initial Order on or around April 2, 2026.

**BASIS FOR RELIEF REQUESTED**

49.     Chapter 15 of the Bankruptcy Code is designed to promote cooperation and comity between courts in the United States and foreign courts, to protect and maximize the value of a debtor's assets and to facilitate the rehabilitation and reorganization of businesses.  The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's foreign restructuring proceeding.

50.     Consistent with these principles, the Foreign Representative commenced ancillary proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the Canadian Proceeding.  Through the Canadian Proceeding and the Chapter 15 Cases, the Debtors intend to close the Sales efficiently, and to obtain approval of a CCAA Plan that will provide for the wind-down of the Debtors' estates.  The Debtors will use the proceeds of

RLF1 35570994v.1

Sales closed during the pendency of the Canadian Proceeding to make distributions in accordance with the priority scheme established under Canadian law.

## I.   Debtors Are Eligible for Chapter 15

### a.   Each Debtor is a "Debtor" Under Section 109(a) of Bankruptcy Code

51.     To the extent section 109(a) of the Bankruptcy Code is applicable to debtors that commence cases under chapter 15,[16] the requirements set forth therein are satisfied here. Under section 109(a) of the Bankruptcy Code, a corporate entity is eligible to be a "debtor" under the Bankruptcy Code where it has "property in the United States."  Section 109(a) does not require a specific quantum of property in the United States.  *See, e.g.*, *In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) ("Therefore, the Court concludes that . . . the language of § 109(a) is clear, and the Court does not have discretion to look behind the language and declare that the quantity of property in the United States will be decisive of eligibility to be a debtor under the Code."); s*ee also In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 200 (Bankr. D. Del. 2015) ("Courts construing the 'property' requirement of § 109(a) to foreign corporations and individuals have determined that the eligibility requirement is satisfied by even a minimal amount of property located in the United States."  (citing *In re Aerovias Nacionales De Colombia S.A. Avianca*, 303 B.R. 1, 8 (Bankr. S.D.N.Y. 2003)).

52.     Each of the Debtors satisfies this standard, having property in the United States.[17]  The Parent Company is the owner of 100% of the equity of Subsidiary Columbia Care

---

[16]    Certain courts in this district have held that the requirements of section 109(a) of the Bankruptcy Code do not apply to debtors seeking chapter 15 relief.  *See, e.g.*, Hr'g Tr. 8:19–9:10, *In re Bemarmara Consulting a.s.*,  No. 13-13037 (KG) (Bankr. D. Del. Dec. 17, 2013), D.I. 38 (holding section 109(a) did not apply to chapter 15 proceeding); *In re Metinvest B.V.*, No. 17-10130 (LSS) (Bankr. D. Del. Feb. 8, 2017), D.I. 19 (same).  But other courts have held that chapter 15 debtors must satisfy section 109(a) requirements.  *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 251 (2d Cir. 2013) (holding that section 109(a) applies in the chapter 15 context).

[17]    *See* CRO Declaration ¶ 37.

RLF1 35570994v.1

LLC, which is a Delaware limited liability company. The Parent Company also has other property in the United States, including bank accounts. Further, each of the Debtors has unearned portions of retainers provided to local counsel. Accordingly, the Debtors are eligible debtors under section 109(a) of the Bankruptcy Code if such provision is, in fact, applicable here.

   b. *Section 1517(a) of Bankruptcy Code is Satisfied*

53.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, a court shall enter an order recognizing a foreign proceeding if (a) such foreign proceeding is a foreign main or foreign nonmain proceeding within the meaning of section 1502, (b) the foreign representative applying is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code. 11 U.S.C. § 1517. The Canadian Proceeding satisfies each of the three requirements under section 1517(a) of the Bankruptcy Code.

**1.    The Canadian Proceeding is a "Foreign Proceeding"**

54.    There is no question that the Canadian Proceeding is a "foreign proceeding" under section 101(23) of the Bankruptcy Code. Courts have determined that section 101(23) breaks down into seven elements:

> (i) a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.

*In re ABC Learning Centres Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013) (citing 11 U.S.C. § 101(23)).

55.    Courts in this district have uniformly recognized CCAA proceedings as "foreign proceedings" under chapter 15 of the Bankruptcy Code. [18]

---

[18]    *See In re VBI Vaccines (Delaware) Inc.*, No. 24-11623 (BLS) (Bankr. D. Del. Aug. 27, 2024), D.I. 24; *In re Goli Nutrition Inc.*, No. 24-10438 (LSS) (Bankr. D. Del. Apr. 18, 2024), D.I. 85; *In re NextPoint Fin. Inc.*, No. 23-10983 (TMH) (Bankr. D. Del. Aug. 16, 2023), D.I. 54; *In re Acerus Pharma. Corp.*, No. 23-10111 (TMH) (Bankr.

RLF1 35570994v.1

### i. The Canadian Proceeding is a "Proceeding"

56.    For purposes of section 101(23), the "hallmark" of a "proceeding" is a "statutory framework that [constrains] a company's actions and that regulates the final distribution of a company's assets" and includes "acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice." *Flynn v. Wallace (In re Irish Bank Resolution Corp.)*, 538 B.R. 692, 697 (D. Del. 2015) (internal quotation marks omitted) (quoting *In re Betcorp Ltd.*, 400 B.R. 266, 278 (Bankr. D. Nev. 2009)).  The CCAA specifies, among other things, the relief and protections provided and available to debtors upon commencement of a Canadian proceeding, the process for the sale of assets or shares or other restructuring transactions, and the process for confirming a plan of arrangement.[19]  Accordingly, the CCAA provides the requisite "statutory framework," governing corporate reorganization and providing for rearrangement of a company's financial obligations in a manner similar to chapter 11 in the United States.  *See Brodski v. Arctic Glacier Income Fund (In re Arctic Glacier Int'l), Inc.*, 901 F.3d 162, 164 (3d. Cir. 2018) (describing the CCAA as "Canada's analogue of Chapter 11 of [the United States] Bankruptcy Code.").

### ii. The Canadian Proceeding is Judicial in Character

57.    A proceeding qualifies as "judicial" when a court oversees such proceeding and exercises its supervisory powers under [applicable law].  *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301, 308 (3d Cir. 2013).  The Canadian Court, with the assistance of the Monitor (an oversight agent appointed by the Canadian Court), oversees the Canadian Proceeding, including any disposition of the Debtors' assets and other relief,

---

D. Del. Feb. 27, 2023), D.I. 78; *In re Motorcycle Tires & Accessories LLC*, No. 19-12706 (KBO) (Bankr. D. Del. Jan. 22, 2020), D.I. 38; *In re Kraus Carpet Inc.*, No. 18-12057 (KG) (Bankr. D. Del. Oct. 1, 2018), D.I. 46.

[19]    Nicholson Declaration ¶ 13–21.

RLF1 35570994v.1

in all cases, in accordance with the CCAA.[20]   As such, the Canadian Proceeding is judicial in nature.

### iii.    The Canadian Proceeding Is Collective in Nature

58.    A proceeding is "collective" if, in overseeing it, the relevant body considers the rights and obligations of all creditors when fashioning relief.  *See ABC Learning Centres*, 445 B.R. at 328 (finding a proceeding collective because it required a foreign liquidator to "consider the rights of all creditors in distributing [assets]" and "distribute assets according to priorities on a pro rata basis").  The Canadian Proceeding is collective in nature as all affected creditors are allowed to participate and intervene in the Canadian Court as the Debtors pursue a value-maximizing process pursuant to the CCAA.  In addition, the Debtors have already taken significant efforts to engage with their creditors, including their Senior Noteholders, the Debtors' fulcrum creditors and largest economic stakeholders.  In connection with the Initial Order, the Monitor will also provide notice to all known creditors of the CC Group with claims over $1,000 CAD, informing such creditors of relief in the Canadian Proceeding that may affect their rights, as applicable.

### iv.    The Canadian Proceeding is Pending in a Foreign Country

59.    The Canadian Court, which oversees the Canadian Proceeding, is located in Ontario, Canada.  Likewise, the Monitor is located in and monitoring the Canadian Proceeding from Canada.

---

[20]    *See* Nicholson Declaration ¶ 11.

23

v.      **The Canadian Proceeding Relates to Adjustment of Debts**

60.     The Canadian Proceeding was initiated under the CCAA—which is a federal Canadian statute enacted for the purpose of facilitating "compromises and arrangements between companies and their creditors."[21]

vi.     **The Canadian Proceeding Subjects Debtors to Supervision of Foreign Court**

61.     The Canadian Proceeding subjects the Debtors' assets and affairs to a foreign court's control or supervision.  Indeed, the Initial Order alone (i) subjected the Debtors' assets and operations to the supervision of the Canadian Court, (ii) appointed FTI Canada as Monitor, an officer of the Canadian Court, to monitor the Debtors' business and financial affairs, and (iii) provided for the notice of all known parties in interest, including creditors, so they may access the Canadian Court to seek relief from the court with respect to the Canadian Proceeding in accordance with the CCAA.  This oversight will continue for the duration of the Canadian Proceeding, including approval of a CCAA Plan.  This is the form of "supervision" contemplated by section 101(23) of the Bankruptcy Code.  *See, e.g.*, 8 Richard Levin & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 1501.03(1) (16th ed. Rev. 2019) ("The ability of a party to ask for court assistance concerning the proceeding is sufficient to satisfy this element.").

vii.    **The Canadian Proceeding is Intended to Facilitate the Sale Process and an Orderly Wind-Down**

62.     As described in the Nicholson Declaration, the CCAA allows debtors to sell assets outside of the ordinary course of business with court approval pursuant to Section 36 of the CCAA, similar to sales of assets pursuant to section 363 of the Bankruptcy Code.  The CCAA, among other things, also contains provisions that implement a stay of proceedings to prevent

---

[21]    Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (Can.), preamble.

RLF1 35570994v.1

creditors from taking adverse actions during a proceeding, allow a debtor to shed burdensome contracts through "disclaimer" (similar to rejection under the Bankruptcy Code), and discharge liabilities to ensure a debtor can emerge from the proceeding as reorganized or wind-down its affairs in an orderly fashion.

63.     In connection with the Canadian Proceeding, the equity or assets of a number of Subsidiaries of the Parent Company will be sold and the remaining assets of the Debtors and their remaining Subsidiaries will be liquidated.  The Debtors and the Subsidiaries will distribute proceeds to the creditors in accordance with Canadian law and wind down their estates.  The CCAA provides an efficient process for the Debtors to complete the foregoing and maximize value for the benefit of creditors.  As such, the Canadian Proceeding was commenced "for the purpose of reorganization or liquidation," in accordance with section 101(23) of the Bankruptcy Code.

      *c.   The Canadian Proceeding is a "Foreign Main Proceeding" or, Alternatively, "Foreign Nonmain" Proceeding*

      1.     **The Canadian Proceeding Qualifies as a Foreign Main Proceeding**

64.     Section 1502(4) defines a "foreign main proceeding" as "a foreign proceeding pending in the country where the debtor has the center of its main interests." *See* 11 U.S.C. § 1502(4).  The Bankruptcy Code does not define center of main interests or "**COMI**."  In the absence of evidence to the contrary, the place of a debtor's registered office is presumed to be the debtor's COMI.  11 U.S.C. § 1516(c).

65.     When courts consider evidence beyond the presumption to determine a debtor's COMI courts place considerable weight on the expectations of creditors.  *See In re InterCement Brasil S.A.*, 668 B.R. 802, 818 (Bankr. S.D.N.Y. 2025) ("[T]he expectations of creditors and other interested parties, as a company's COMI must be 'ascertainable to third

parties.'") (citation omitted); *see also In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017). Those expectations can be ascertained from the terms of offering memoranda and indentures. *See InterCement Brasil*, 668 B.R. at 818 ("In practice, the evaluation of creditor expectations has focused on reviewing disclosures in offering memoranda and indentures."). For example, in *In re Modern Land (China) Co., Ltd.*, the court determined a debtor's COMI to be in the Cayman Islands, placing considerable weight on the offering memoranda issued by the debtor in connection with the offering of notes that provided that, in the event of insolvency, a Cayman insolvency proceeding would be initiated in the Cayman Islands and also on press releases identifying the company as a Cayman company. *In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 787–88 (Bankr. S.D.N.Y. 2022). Thus, the court held the proceeding was a foreign main proceeding. *Id*.

66. Additionally, courts have taken into account a debtor's pre-filing restructuring activity in ascertaining its COMI. *See InterCement*, 668 B.R. at 818–19; *see also In re OAS S.A.*, 533 B.R. 83, 101–02 (Bankr. S.D.N.Y. 2015). Such efforts "may include the negotiation or execution of a restructuring framework or support agreement, holding of meetings with creditors, or other operational or liquidation activities or administrative functions." *InterCement*, 668 B.R. at 819.

67. Each of the Debtors is incorporated in and has its registered office address located in Canada. Accordingly, pursuant to section 1516 of the Bankruptcy Code, there is a statutory presumption that each of the Debtors has its COMI in Canada. 11 U.S.C. § 1516(c).

68. In the event it is necessary for the Court to consider the Debtors' COMI further notwithstanding the presumption in section 1516(c), further evidence supports finding that each of the Debtors' COMI is in Canada.

26

69.     The Parent Company is a publicly listed company in Canada, with its stock trading on CBOE, a Canadian stock exchange in Toronto, Ontario.  Since its formation, the Parent Company raised hundreds of millions of dollars to the benefit of the CC Group and its stakeholders through common stock offerings executed through Canadian agents in the Canadian capital markets.

70.     Moreover, the A&R Indenture, pursuant to which the Debtors issued $270 million of Senior Notes, is governed by Canadian law.  The terms of the Canadian-law governed A&R Indenture are publicly available to all creditors and equity holders.[22]  The issuance of Canadian-law governed Senior Notes by two Canadian Debtor entities reflects creditor expectations that any restructuring activities related to those Senior Notes would primarily occur in Canada.  *See InterCement*, 668 B.R. at 818–19.  Further, a sizable portion of the Senior Noteholders—at least 37% of the principal value of the Senior Notes as of the CCAA Commencement Date—are domiciled in Canada.

71.     Perhaps the best evidence of the reasonable expectations of the stakeholders regarding any of the Debtors' future restructuring activities regarding its outstanding obligations is the CBCA Restructuring Transaction, a separate restructuring proceeding consummated in 2025 in Canada—which was publicly announced, with information available to all creditors of the Debtors and the CC Group.[23]

72.     The above-described restructuring transactions taken in the past twelve months have been publicly disclosed by the Parent Company and supported by a majority of Senior

---

[22]  *See* The Cannabist Company Holdings Inc., Form 8-K (filed June 4, 2025), https://www.sec.gov/Archives/edgar/data/1776738/000110465925056402/tm2517085d1_8k.htm.

[23]  *See* The Cannabist Company Holdings Inc., Form 8-K (filed June 4, 2025), https://www.sec.gov/Archives/edgar/data/1776738/000110465925056402/tm2517085d1_8k.htm.

27

Noteholders.[24]   The Supporting Noteholders are party to the Canadian-law governed Support Agreement represent approximately 60% of the Senior Notes,[25] which demonstrates not only expectations but also support by creditors for each of the Debtors to restructure their debts in Canada.   The expectations of the Senior Noteholders—who are by far the largest economic stakeholder in the Canadian Proceeding, with the amount outstanding under the Senior Notes that is significantly in excess of the value that the Sales are expected to provide—are instructive.   Based on the foregoing, the Senior Noteholders have expected and currently expect the Debtors will use Canadian insolvency laws, including the CCAA, and Canadian courts, including the Canadian Court, to address their debt obligations.

73.   Indeed, the Support Agreement, in conjunction with the commencement of the Canadian Proceeding and appointment of the Monitor, an officer of the Canadian Court, makes clear that the Debtors' decision-making is largely Canadian-driven as they consummate the Sales and wind-down their operations through a CCAA Plan.

74.   Accordingly, because each of the Debtors has its COMI in Canada, the Canadian Proceeding is entitled to recognition as a foreign main proceeding.

2.   **The Canadian Proceeding Qualifies as a Foreign Nonmain Proceeding**

75.   In the alternative, the Canadian Proceeding is entitled to recognition as a "foreign nonmain proceeding."   A "foreign nonmain proceeding" is a "foreign proceeding" pending where the debtor has an "establishment."   Section 1502(2) of the Bankruptcy Code broadly defines "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity."   11 U.S.C. § 1502(2).   Establishment, a lower bar than COMI,

---

[24]   *See* The Cannabist Company Holdings Inc., Form 8-K (filed Feb. 27, 2025), https://www.sec.gov/Archives/edgar/data/1776738/000119312525038557/d860118d8k.htm.

[25]   CRO Declaration ¶ 35.

requires only "a showing of a local effect on the marketplace[.]" *In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 786 (Bankr. S.D.N.Y. 2022 (internal quotation marks and citation omitted); *see also In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 277 (Bankr. S.D.N.Y. 2019).

76.     The Debtors have an "establishment" in Canada given the scope of its business connections to Canada described above in paragraphs 66–72.  As set forth above, each of the Debtors is a co-issuer of the Senior Notes issued under the A&R Indenture that is governed by Canadian law.  Further, the financial results of the Debtors inform public investment in the Senior Notes and the Canadian Parent Company's Canadian-listed equity.  Thus, the Debtors impact the Canadian "marketplace," as their financial performance determines when investors buy and sell the Senior Notes and the Canadian Parent Company's securities, including on the Canadian exchange.

77.     Accordingly, even if the Canadian Proceeding is not recognized as a foreign main proceeding, the Canadian Proceeding should be recognized as a "foreign nonmain proceeding."

d. *Chapter 15 Cases Were Commenced by a Duly-Authorized "Foreign Representative"*

78.     For a recognition motion to be granted, a foreign debtor's application for recognition must be made by a "foreign representative."  *See* 11 U.S.C. §§ 1515(a), 1517(a)(2).  Section 101(24) defines "foreign representative" as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

29

11 U.S.C. § 101(24).  Where the court in the foreign proceeding authorizes a person or body to act as the foreign representative for a chapter 15 case, section 1516(a) of the Bankruptcy Code entitles the U.S. bankruptcy court to presume such authority.  11 U.S.C. § 1516(a).

79.    Here, the Parent Company is the Debtors' "foreign representative."  On March 23, 2026, the Board appointed the Parent Company to serve as its "foreign representative" and to apply for this recognition in the Chapter 15 Cases.  Pursuant to the Initial Order, the Canadian Court authorized the appointment of the Parent Company as the Foreign Representative, authorized and empowered the Foreign Representative to act as the foreign representative in respect of the Canadian Proceeding, and authorized the Foreign Representative to commence the Chapter 15 Cases for the purposes of having the Canadian Proceeding recognized.  *See* Initial Order ¶¶ 46–47.

e.    *Verified Petitions Satisfy Section 1515 and Bankruptcy Rule 1007(a)(4)*

80.    The Foreign Representative properly commenced the Chapter 15 Cases by filing the Chapter 15 Petitions in accordance with section 1515(a) of the Bankruptcy Code, accompanied by all documents and information required by Bankruptcy Rule 1007(a)(4) and sections 1515(b) and (c) of the Bankruptcy Code, including this motion.  Under sections 1515(b) and (c) of the Bankruptcy Code:

> (b) A petition for recognition shall be accompanied by—
>
> > (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
> >
> > (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
> >
> > (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

30

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

11 U.S.C. § 1515(b)–(c).  Bankruptcy Rule 1007(a)(4) requires that a chapter 15 petition include: (i) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1 and (ii) a list containing (a) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, (b) all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and (c) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code.

81.     Annexed to the Chapter 15 Petitions and the CRO Declaration is a certified copy of the Initial Order confirming the appointment of the Foreign Representative.  In addition, the Chapter 15 Petitions include all documents and information required by the Bankruptcy Code, Bankruptcy Rules, and Local Rules.  Accordingly, the Foreign Representative has satisfied the requirements of sections 1515(b) and (c) of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).

## II.     Additional Relief Pursuant to Section 1521

82.     In addition to the relief automatically provided under section 1520 upon recognition as a foreign main proceeding, the Bankruptcy Code provides that discretionary relief may be available under section 1521(a) of the Bankruptcy Code in both foreign main and foreign nonmain proceedings.  Such relief is available upon the determination that it is "necessary to effectuate the purpose of [chapter 15] and to protect the debtor's assets or the interests of creditors," and includes, among other things;

1. staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

2. staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

3. suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a); . . .

6. extending relief granted under section 1519(a); and

7. granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a)(1)–(3), (6), (7).

83. A fair and efficient administration of the Canadian Proceeding requires that all creditors be bound by the terms of the Canadian Proceeding and actions sanctioned by the Canadian Court. *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714–15 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); *In re Energy Coal S.P.A.*, 582 B.R. 619, 626–27 (Bankr. D. Del. 2018) (acknowledging the broad principles of comity applied by United States courts in both recognition of foreign bankruptcies and post-recognition relief granted to foreign representatives).

84. *First*, without the benefit of the stay of actions against the Debtors and Stay Parties, there is a real and significant risk that the underlying value of the Debtors' property interests (i.e., the Debtors' cash and equity ownership of non-Debtor Subsidiaries) will be harmed notwithstanding the Canadian Proceeding and the stay set forth in the Initial Order. As Justice J. Dietrich of the Canadian Court found in her endorsement following the initial hearing in the CCAA Proceeding:

> [P]rotection of the Subsidiaries is critical to the success of the Applicants' restructuring efforts and these CCAA Proceedings. None of the Applicants are operating companies – all of the Company's cannabis operating companies are Subsidiaries and to

32

> preserve the value-maximizing Sale Transactions, the Subsidiaries need the protection of the Stay to operate in the ordinary course. Further, extending the Stay to the Subsidiaries will also mitigate against the risk of uncoordinated enforcement attempts in different jurisdictions, all of which would be counterproductive to the maximization and protection of value for the Company and its stakeholders.

*In re The Cannabist Co. Holdings Inc. and The Cannabist Co. Holdings (Canada) Inc.*, No. CL-00000122-0000 (Can. Ont. Sup. Ct. J. (Comm. List) Mar. 24, 2026), ¶ 33.

85.     Allowing the CC Group's creditors to take adverse action in the United States against the Stay Parties to proceed during the pendency of the Canadian Proceeding would interfere with the closing of Sales and wind-down of the CC Group.  Without recognition, for example, parties asserting claims (such as the IRS or mortgagors) might pursue members of the CC Group for such claims.  Further, absent recognition, if the Support Agreement were terminated, Senior Noteholders in the United States might seek to exercise remedies against the property of Debtors and their non-Debtor affiliates that guarantee the Senior Notes.  Moreover, if any of the approximately 70 leases that entities in the CC Group are party to are terminated (a number of which the Parent Company guaranties), there will be a significant risk of disruption to the CC Group's operations and value erosion.  The CC Group also has hundreds of vendors that it transacts with in the course of business, including software providers, pest control providers, and logistics providers.  Such vendors could cease providing services on the basis of pre-filing payments owed, harming the underlying value of the businesses the CC Group seeks to sell.

86.     *Second*, certain of the Stay Parties are party to contracts or leases that contain provisions allowing a counterparty to terminate upon the commencement of the Canadian Proceeding.  Without the relief requested by this motion, those counterparties may attempt to terminate and jeopardize the Sales.

87.     *Third*, pursuant to the Amended and Restated Initial Order, the Canadian Court has authorized the Stay Parties to cease their public reporting obligations "that may be required by any federal, state, provincial, or other law respecting securities or capital markets in Canada or the United States. . . ." Amended and Restated Initial Order ¶ 53. The Canadian Court ordered that any persons responsible for such reporting would not "have any personal liability for any failure by the [Debtors] to make any Securities Filings required by the Securities Provisions during the Stay Period. . . ." Amended and Restated Initial Order ¶ 54. Recognition of such relief will remove the burden of the expenses and time associated with such filings to provide a value-maximizing process. Given the CC Group intends to wind-down its remaining affairs, the Parent Company does not intend to maintain its public listing. Without the requested relief, the Parent Company will need to continue to incur expenses associated with the public listing during the Canadian Proceeding would cost valuable (and limited) estate resources.

III.    **Relief Requested Achieves Bankruptcy Code's Objectives and Policy**

88.     Recognition of the Canadian Proceeding, as requested in this motion, comports with the purposes of chapter 15 and the Bankruptcy Code. The purpose of chapter 15 is set forth in section 1501 of the Bankruptcy Code and includes:

> (i) cooperation between (a) courts of the United States, the United States Trustee, trustees, examiners, debtors, and debtors in possession; and (b) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases; (ii) greater legal certainty for trade and investment; (iii) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; (iv) protection and maximization of the value of the debtor's assets; and (v) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving

34

employment.

11 U.S.C. § 1501.

89.     The substantive purpose of chapter 15 will be fulfilled here by granting recognition to the rulings of a sister common law jurisdiction, as requested herein. *See* 11 U.S.C. § 1501(a)(1).  Recognizing the Canadian Proceeding promotes the fair and efficient administration of a cross-border reorganization procedure that protects the interests of all affected parties.

90.     In particular, recognition will further promote the "protection and maximization of the debtors' assets" and facilitate the "rescue of troubled businesses."  *Cf.* 11. U.S.C. § 1501(a)(4)–(5).  The Canadian Proceeding provides a value-maximizing path forward for the Debtors' (and CC Group's) stakeholders.  As set forth in the Nicholson Declaration, Canadian CCAA proceedings often result in greater recoveries for creditors.[26]  If the relief request herein is not granted, the prospects of recoveries for creditors will be hindered.  Indeed, if the Canadian Proceeding is not recognized in the U.S., there will be no mechanism to prevent a proverbial race to the courthouse, an outcome that the Bankruptcy Code seeks to avoid.  Absent recognition of the Canadian Proceeding, such a scenario will only be further complicated by the uncertainty of the appropriate forum for parties to seek relief as no single court would have jurisdiction over all the creditors.  Accordingly, and consistent with the objectives of chapter 15 of the Bankruptcy Code, the Foreign Representative commenced the Chapter 15 Cases to obtain recognition of the Canadian Proceeding.

91.     Recognition is also consistent with section 1506 of the Bankruptcy Code which provides that nothing in chapter 15 "prevents the court from refusing to take actions governed by [chapter 15] if the action would be manifestly contrary to the public policy of the

---

[26]    *See* Nicholson Declaration ¶ 23.

RLF1 35570994v.1

United States." 11 U.S.C. § 1506. Section 1506 is not applicable to the relief requested in this motion. If anything, recognition would advance United States public policy.

92. Courts have consistently recognized that section 1506 provides an exceedingly narrow exception to chapter 15's general policy in favor of recognition, and "should only be invoked under exceptional circumstances." *ABC Learning Centres*, 728 F.3d 301 at 309; *see also Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1021 (5th Cir. 2010) (this "narrow public policy exception" is "intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States"); *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 139 (2d Cir. 2013) (same). This reflects the statutory text, which applies only if the action in question is "*manifestly* contrary to the public policy of the United States." 11 U.S.C. § 1506 (emphasis added).

93. Section 1506's exceedingly limited scope reflects its origins: section 1506 follows a provision of the Model Law promulgated by the United Nations Commission on International Trade Law "exactly," and this provision "has been ***narrowly interpreted on a consistent basis in courts around the world***." *Fairfield Sentry*, 714 F.3d at 139 (emphasis added); *see also* 11 U.S.C. § 1508 ("In interpreting [chapter 15], the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."). It is also consistent with the statute's codified purpose, which is to facilitate "cases of cross-border insolvency," and ensure cooperation between courts of the United States and the courts of foreign countries. 11 U.S.C. § 1501. And it is also consistent with the "principles of comity and respect for sovereignty underlying the recognition of foreign judgments." *Ohno v. Yasuma*, 723 F.3d 984, 1000 (9th Cir. 2013).

94. On the few occasions where courts have declined to recognize a foreign proceeding as manifestly contrary to United States public policy under section 1506, it has been because "the procedural fairness of the foreign proceeding is in doubt" or where recognition "would impinge severely a . . . constitutional or statutory right." *ABC Learning Centres*, 728 F.3d at 309. For instance, courts have invoked § 1506 to deny requested chapter 15 relief that would freeze assets or allow for personal jurisdiction without due process, or that would require intercepting individuals' private communications in violation of their rights under the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508 100 Stat. 1848 (1986) or the *Stored Communications Act*, 18 U.S.C. §2701. *See In re Nexgenesis Holdings Ltda.*, 662 B.R. 406, 419 (Bankr. S.D. Fla. 2024) (due process); *In re Toft*, 453 B.R. 186, 189, 197–98 (Bankr. S.D.N.Y. 2011) (Electronic Communications Privacy Act); *In re Irish Bank Resolution Corp. Ltd.*, 559 B.R. 627, 648 (Bankr. D. Del. 2016) (Stored Communications Act). To the Debtors' knowledge, no court has denied recognition of a Canadian proceeding based on section 1506.

95. The Debtors' proceeding under the CCAA is a fair proceeding that does not violate any United States constitutional or statutory protections afforded to creditors. As U.S. bankruptcy courts routinely recognize, Canada "share[s] the same common law traditions and principles of law as the United States" and "afford[s] creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process." *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 698 (Bankr. S.D.N.Y. 2010) ("U.S. federal courts have repeatedly granted comity to Canadian proceedings.").

96. More fundamentally, recognition will facilitate cooperation between Canada and the United States—nations that share a longstanding common law tradition of cooperation and comity—and would respect, long standing precedent by which proceedings under

the CCAA are recognized as a matter of U.S. law.[27]  Indeed, failure to recognize a proceeding under the CCAA would be a significant break from long-standing practice and fundamental principles of comity.

## CONCLUSION

97.     For the reasons set forth herein, and on the record set forth in the CRO Declaration and in the Nicholson Declaration, and as the Foreign Representative will be further prepared to establish at the Court's hearing to consider approval of the relief requested, the Foreign Representative respectfully requests that the Court enter the Proposed Order attached hereto as **Exhibit A**.

## NOTICE

98.     Notice of the Verified Petitions will be provided in accordance with the procedures set forth in the order approving the contemporaneously filed *Motion for Entry of Order (I) Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice and (II) Granting Related Relief* (the "**Scheduling Order**").  The Foreign Representative respectfully submits that no further notice is required.

## RESERVATION OF RIGHTS

99.     The relief requested in this Motion is without prejudice to any additional relief the Foreign Representative may request.

---

[27]   *See, e.g., In re Goli Nutrition Inc.*, No. 24-10438 (LSS) (Bankr. D. Del. Apr. 18, 2024), D.I. 85; *In re Acerus Pharma. Corp.*, No. 23-10111 (TMH) (Bankr. D. Del. Feb. 27, 2023), D.I. 78; *In re VBI Vaccines (Delaware) Inc.*, No. 24-11623 (BLS) (Bankr. D. Del. Aug. 27, 2024), D.I. 24; *In re Motorcycle Tires & Accessories LLC*, No. 19-12706 (KBO) (Bankr. D. Del. Jan. 22, 2020), D.I. 38; *In re Kraus Carpet Inc.*, No. 18-12057 (KG) (Bankr. D. Del. Oct. 1, 2018), D.I. 46; *In re NextPoint Fin. Inc.*, No. 23-10983 (TMH) (Bankr. D. Del. Aug. 16, 2023), D.I. 54.

RLF1 35570994v.1

## NO PRIOR REQUEST

100.   No previous request for the relief sought herein has been made by the Foreign Representative to this or any other court.

RLF1 35570994v.1

WHEREFORE the Foreign Representative respectfully requests entry of the Proposed Order attached hereto as **Exhibit A** granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: March 25, 2026
       Wilmington, Delaware

                                     */s/ Zachary I. Shapiro*

RICHARDS, LAYTON & FINGER, P.A.
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
Zachary J. Javorsky (No. 7069)
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Email: shapiro@rlf.com
       schlauch@rlf.com
       javorsky@rlf.com
-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (*pro hac vice* pending)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Email: davidj.cohen@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Garrett A. Fail (*pro hac vice* pending)
Alexander P. Cohen (*pro hac vice* pending)
Andrew J. Clarke (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: garrett.fail@weil.com
       alexander.cohen@weil.com
       andrew.clarke@weil.com

*Attorneys for the Foreign Representative*

RLF1 35570994v.1