**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| | : | |
| **In re:** | : | **Chapter 15** |
| | : | |
| **THE CANNABIST COMPANY** | : | **Case No. 26–_____ ([●])** |
| **HOLDINGS INC.,** *et al.,* | : | |
| | : | |
| **Debtors in a Foreign Proceeding.**[1] | : | **(Joint Administration Requested)** |
| | : | |

--------------------------------------------------------------- x

**DECLARATION OF CURT KROLL IN SUPPORT**
**OF MOTIONS FOR (I) PROVISIONAL RELIEF AND (II) RECOGNITION OF**
**FOREIGN PROCEEDING AND REQUEST FOR CERTAIN RELATED RELIEF**

I, Curt Kroll, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury under the laws of the United States that the following is true to the best of my knowledge, information, and belief:

1.      I am partner of Sierra Constellation Partners LLC ("**SCP**"), the Chief Restructuring Officer of The Cannabist Company Holdings Inc. (the "**Parent Company**"), in its capacity as the duly-appointed foreign representative (the "**Foreign Representative**") of the Parent Company and its debtor affiliate The Cannabist Company Holdings (Canada) Inc. ("**The Cannabist Canada Company**," and together with the Parent Company, the "**Debtors**"), which are the subject of a proceeding (the "**Canadian Proceeding**") currently pending in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") and initiated

---

[1]     The Debtors in the Chapter 15 Cases, together with the last four digits of their federal tax identification number or Canadian business number, as applicable, are: (i) The Cannabist Company Holdings Inc. (8978) and (ii) The Cannabist Company Holdings (Canada) Inc. (9428).  The location of the Parent Company's registered office and the Debtors' service address is: 666 Burrard St #1700, Vancouver, British Columbia V6C 2X8, Canada. Additional information may be obtained on the website of the Debtors' information agent at https://www.veritaglobal.net/CCGroup.

pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended, the "**CCAA**").

2.    I hold both a bachelor's and master's degree in accounting from the University of Missouri.  I have extensive experience providing interim management and operational and financial advisory services to underperforming companies and companies in transition.  My focus includes refinancings, distressed acquisitions, and in- and out-of-court restructurings.  Prior to joining SCP, I was the chief financial officer and chief information officer at Katy Industries, Inc. (a publicly traded company) and previously served as a manager at Deloitte Touche Tohmatsu Limited.

3.    I am authorized to submit this declaration (this "**Declaration**") on behalf of the Debtors in support of the (i) *Motion for Recognition of Foreign Proceeding and Request for Certain Related Relief* (the "**Recognition Motion**" and, together with each of the Debtors' *Voluntary Chapter 15 Petition* (the "**Chapter 15 Petitions**"), filed contemporaneously herewith, the "**Verified Petitions**")[2] and (ii) *Motion for Provisional Relief Pursuant to Section 1519 of Bankruptcy Code* (the "**Provisional Relief Motion**," and the relief sought thereunder, the "**Provisional Relief**"), each filed contemporaneously herewith.

4.    Except as otherwise disclosed herein, all statements in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the CC Group (as defined below), or my opinion based upon my experience, knowledge, and information concerning the CC Group's operations.  I am over the

---

[2]    Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Verified Petition.

age of 18 and, if called upon to testify, I could testify competently to the facts set forth in this Declaration.

5.      I have been actively involved in the CC Group's Sale Process (as defined below), including the proposed sale of the CC Group's remaining assets, and planned wind-down through the Canadian Proceeding, as further discussed below.[3]

6.      On March 24, 2026, (the "**CCAA Commencement Date**"), the Debtors applied for protection in the Canadian Court pursuant to the CCAA, and, on the same day, such protection was granted under the initial order (as amended, supplemented, extended, restated, or otherwise modified from time to time, the "**Initial Order**").

7.      I understand the Debtors expect that the Canadian Court will enter an amended and restated Initial Order on or around April 2, 2026 (the "**Amended and Restated Initial Order**").

8.      In this Declaration, I provide a description of, among other things, the following: (i) the CC Group's business and corporate structure; (ii) the CC Group's capital structure; (iii) the events leading to the commencement of the Canadian Proceeding and the above-referenced chapter 15 cases (the "**Chapter 15 Cases**"); and (iv) the factual basis for the relief being requesting from the Court in the Recognition Motion and Provisional Relief Motion.

## I.      CC Group's Business and Corporate Structure

9.      The Parent Company is a Canadian holding company, publicly traded on the Cboe Canada Inc. stock exchange ("**CBOE**") in Toronto, Ontario, and an issuer of approximately $180 million of outstanding Canadian-law-governed secured debt.  It is the parent

---

[3]    Additional information regarding the Canadian Proceeding may be found in the *Declaration of Lee Nicholson as Canadian Counsel to Debtors in Support of Recognition of Foreign Proceeding*, filed contemporaneously herewith.

of its affiliated Debtor, The Cannabist Canada Company, and the ultimate parent of non-Debtor subsidiaries (the "**Subsidiaries**," and each, a "**Subsidiary**," and collectively with the Debtors, the "**CC Group**").  The Cannabist Canada Company is the co-issuer of that debt.  Certain other Subsidiaries are guarantors of that debt.

10.    Certain of the Parent Company's direct and indirect Subsidiaries (the "**Non-Cannabis Subsidiaries**") are intermediate holding companies, which own the equity of other Subsidiaries, or operating companies, which conduct management and administrative functions for the CC Group.  Certain of the Parent Company's indirect Subsidiaries (the "**Cannabis Subsidiaries**") operate cannabis businesses in eight states where medical or adult-use cannabis is legally permitted under state law.  The Cannabis Subsidiaries *are not* Debtors in the Canadian Proceeding or the Chapter 15 Cases.  An illustrative chart summarizing the Debtors' organizational structure is below, and a more detailed chart of the CC Group's organizational structure is attached hereto as **Exhibit A**.



RLF1 35570928v.1

*a. Debtors*

11.     The Parent Company is incorporated under the *Business Corporations Act* (British Columbia), maintains a registered and records office address in Vancouver, British Columbia, and has its common shares publicly listed under the ticker symbol "CBST" on the CBOE, a Canadian stock exchange based in Toronto, Ontario.  Common shares of the Parent Company also trade under the ticker symbol "CBSTF" on the OTCQB, an over-the-counter stock exchange operated by the OTC Markets Group in the United States.

12.     Between 2019 and 2024, the Parent Company raised through Canadian agents approximately $340 million CAD through the issuance of common stock and $320 million in secured debt from the Canadian capital markets.  The designated market maker for the Parent Company was RBC Dominion Securities Inc., and its transfer agent and trustee of the A&R Indenture is Odyssey Trust Company, having its principal offices in Vancouver, British Columbia.

13.     The Cannabist Canada Company is incorporated under the *Business Corporations Act* (Ontario), and its registered office is located in Toronto, Ontario.  As set forth above it is a co-issuer of the Senior Notes (as defined below).

*b. Subsidiaries*

14.     The Parent Company oversees the CC Group.  The CC Group's Non-Cannabis Subsidiaries are either (i) intermediate holding companies which own the equity of other Subsidiaries, or (ii) operating companies which conduct management and administrative functions for the CC Group, including employing the CC Group's approximately 1,200 employees.  The Non-Cannabis Subsidiaries do not produce, sell, otherwise handle cannabis, or hold licenses for production, sale, or handling of cannabis.

RLF1 35570928v.1

15.     The Cannabis Subsidiaries hold licenses from relevant state authorities and produce, sell, and/or handle cannabis in their day-to-day operations in accordance with licenses, applicable laws, and regulations.  The Cannabis Subsidiaries are not Debtors in the Chapter 15 Cases.  Equity and assets of certain of these entities are being sold as part of the Sales, and others are being wound down.

## III.     CC Group's Capital Structure

16.     As of the CCAA Commencement Date, the CC Group's capital structure includes approximately $220 million in funded debt, summarized below.

### a.  Debt Obligations

### 1.     Senior Notes

17.     The CC Group's secured indebtedness consists primarily of the principal amount of approximately $179 million of senior notes (the "**Senior Notes**") issued pursuant to that certain *Amended and Restated Trust Indenture*, dated May 29, 2025 (as amended, supplemented, and otherwise modified from time to time, the "**A&R Indenture**"), entered into between the Parent Company and The Cannabist Canada Company, as co-issuers, and and Odyssey Trust Company, acting as trustee on behalf of the holders of Senior Notes (the "**Senior Noteholders**").

18.     The Senior Notes are comprised of (a) senior secured notes bearing interest at a rate of 9.25% per annum in the aggregate principal amount of $166,262,000; and (b) senior secured convertible notes bearing interest at a rate of 9.0% per annum in the aggregate principal amount of $12,731,000.  I understand that the Senior Noteholders have been secured by substantially all the assets of the CC Group since the Senior Notes were issued.  I understand three of the five largest Senior Noteholders, holding approximately 37% of the debt, are domiciled in Canada.

RLF1 35570928v.1

19.     On December 31, 2025, due to liquidity constraints, the CC Group elected not to make the Senior Notes interest payment due on such date.  The failure to make an interest payment was subject to a 30-day grace period and became an event of default under the A&R Indenture on January 30, 2026 (the "**Specified Default**").

20.     On January 29, 2026, the CC Group entered into a forbearance agreement with a majority of the Senior Noteholders (the "**Forbearing Noteholders**"), pursuant to which the Forbearing Noteholders agreed to forbear from exercising any rights and remedies with respect to the Specified Default until February 17, 2026 (subject to certain other terms and conditions).  On February 17, 2026, the CC Group and the Forbearing Noteholders agreed to extend the forbearance period through February 20, 2026.  On February 20, 2026, the CC Group and the Forbearing Noteholders agreed to a further extension of the forbearance until February 27, 2026.  On February 27, 2026, the CC Group and the Forbearing Noteholders agreed to a further extension of the forbearance until March 6, 2026.  On March 6, 2026, the CC Group and the Forbearing Noteholders agreed to a further extension of the forbearance until March 17, 2026.  On March 17, 2026, the CC Group and the Forbearing Noteholders agreed to a further extension of the forbearance until March 25, 2026.

**2.     Mortgage Debt**

21.     Three non-Debtor Subsidiaries are indebted to East West Bank in the aggregate amount of approximately $40.4 million pursuant to three separate loan agreements. Each loan agreement is secured by a mortgage over separate real property and is guaranteed by the Parent Company.

RLF1 35570928v.1

b. *Unsecured Obligations*

22.    In addition to ordinary course vendors and other commercial obligations, the CC Group's unsecured obligations include liabilities in connection with lease obligations, disputed federal tax liabilities, and contingent liabilities associated with ongoing litigation.

### 3.    Lease Liabilities

23.    The CC Group has leases in various states.  The leases are between various landlords, and Subsidiary entities within the CC Group, as tenants.  The Parent Company guarantees 13 of these leases.

### 4.    Disputed Tax Liabilities

24.    Certain entities within the CC Group that are classified as corporations for United States federal income tax purposes file a consolidated United States federal income tax return with the Parent Company as part of a consolidated tax group (the "**Tax Group**").  I am advised that each member of the Tax Group is independently liable for the entire United States federal income tax liabilities of the Tax Group incurred during taxable years in which such members were part of the Tax Group.

25.    I am informed that the Internal Revenue Service (the "**IRS**") has taken the position that Section 280E if the Internal Revenue Code ("**Section 280E**") prevents the Parent Company from taking deductions or credits for any amount paid or incurred during the taxable year in carrying on its cannabis business (or the activities that comprise such business). *See* 28 U.S.C. § 280E.  The CC Group disputes this position.  I understand that the IRS's enforcement of Section 280E with respect to the Parent Company has resulted in the IRS asserting federal income tax claims in the approximate amount of $51 million for the 2022 and 2023 tax years.  I understand that the Parent Company has filed its tax returns and amended certain previous

8

RLF1 35570928v.1

returns on the basis that Section 280E is not applicable.  I am informed that this is a position taken by numerous publicly-listed multi-state operators in the industry who dispute the applicability of Section 280E.

26.    I understand that, notwithstanding the Parent Company's position, in September 2024, the IRS demanded payment from the Parent Company for its asserted federal income tax liability related to the 2022 tax year (the "**2022 Asserted Tax Debt**").  I further understand that in November 2024, the IRS demanded payment from the Parent Company for asserted tax liabilities with respect to the 2023 tax year (the "**2023 Asserted Tax Debt**," together with the 2022 Asserted Tax Debt, the "**22–23 Asserted Tax Debt**").  I am advised that in connection with these demands the IRS filed a federal tax lien on the Parent Company's assets. Subsequently, the Parent Company and the IRS agreed to a payment plan where the Parent Company would pay the IRS $500,000 per month in relation to the 22–23 Asserted Tax Debt (the "**IRS Payment Plan**"), the IRS agreed to release its lien, and the Parent Company agreed to pay the IRS $500,000 per month until the 22–23 Asserted Tax Debt is paid in full.  I am further advised that, in April 2025, the IRS issued a notice of levy on certain accounts in the name of the Parent Company after the Parent Company failed to make a timely monthly payment under the IRS Payment Plan.  The Parent Company is concerned that if it fails to make the monthly payment to the IRS in accordance with the IRS Payment Plan, the IRS will attempt to levy again, and subsequently garnish, the Parent Company or other members of the Tax Group's bank accounts.

## IV.    Events Leading to Canadian Proceeding and Chapter 15 Cases

27.    The CC Group has faced significant headwinds in recent years, including competitive pressures, supply-chain challenges, and challenges gaining access to capital markets.

28.    In response to the challenges the CC Group has faced, beginning in 2023, the CC Group undertook a series of operational restructuring initiatives, such as the divestitures of

9

underperforming assets, the streamlining and reorganization of various business lines, reductions in overall headcount, implementation of cost-containment measures, and improvements to operational efficiencies.  The CC Group also pursued multiple capital-raising initiatives, including equity and debt financings, and has conducted multiple strategic review processes with the assistance of its financial and legal advisors.  Prior to the CCAA Commencement Date, the CC Group dissolved a number of dormant subsidiaries.

### a.  CBCA Restructuring Transaction

29.    Prior to entry into the A&R Indenture in 2025, the CC Group's secured indebtedness consisted primarily of $270 million of senior notes: (a) senior notes in the amount of $59.5 million principal maturing on June 29, 2025 (the "**2025 Notes**"); (b) senior notes in the amount of $185.5 million principal maturing on February 3, 2026 (the "**2026 Notes**"); and (c) senior notes in the amount of $25.5 million principal maturing on March 19, 2027.

30.    In or around October 2024, facing the maturity of the 2025 Notes and 2026 Notes within 12 months, the CC Group explored options to extend its runway.  After extensive negotiations with an ad hoc group of senior noteholders in respect of the Canadian-law governed senior notes, the CC Group entered into a support agreement with such group to consummate the CBCA Restructuring Transaction, which was ultimately effectuated through a proceeding commenced and approved in the Canadian Court.  The CBCA Restructuring Transaction extended the maturity for all the CC Group's then-outstanding senior debt to December 31, 2028, through the issuance of Senior Notes in exchange for the then-outstanding senior debt.

### b.  Sale Process

31.    Following the CBCA Restructuring Transaction, in June 2025, the CC Group commenced a sale process (the "**Sale Process**," and the sales in connection therewith,

the "**Sales**") with the assistance of Moelis & Company LLC ("**Moelis**") to seek the value-maximizing transactions for the CC Group and its stakeholders through a sale of the CC Group or multiple sales of certain strategic markets. The Parent Company subsequently formed a special committee composed of independent directors of its board of directors to oversee the Sale Process and to make recommendations regarding the ultimate path forward for the CC Group. In addition to the Sale Process, the Parent Company continued its already ongoing sale process with respect to the CC Group's California operations (the "**California Process**").

32.     Moelis led a rigorous Sale Process involving 29 potential bidders. The Sale Process, along with the California Process, has resulted in three closed sales transactions (the "**Closed Transactions**") and two signed sale transactions (the "**Signed Transactions**"), summarized below:

**Closed Transactions**

- **CA Mission Bay Sale**. On January 30, 2026, certain members of the CC Group closed an equity sale of former Subsidiary Mission Bay LLC for approximately $1 million.

- **Virginia Sale**. On February 5, 2026, certain members of the CC Group closed a sale for the equity of former Subsidiary Green Leaf Medical of Virginia, LLC in the Virginia market for approximately $130 million (the "**Virginia Sale**").

- **CA Focused Health Sale**. In March 2026, certain members of the CC Group closed a sale for the equity of former Subsidiary Focused Health, LLC.

**Signed Transactions**

- **Delaware Sale**. On March 23, 2026, certain members of the CC Group entered into an agreement for the sale of certain assets of Columbia Care Delaware, LLC, in the Delaware market for approximately $16.5 million (the "**Delaware Sale**").

- **Ohio Sale**. On March 23, 2026, certain members of the CC Group entered into an agreement for the sale of the equity of six CC Group's Subsidiaries in the Ohio market for approximately $47 million (the "**Ohio Sale**").

11

33.     In addition, prior to the CCAA Commencement Date, the Parent Company entered a non-binding memorandum of understanding with respect to the sale of its businesses in the Colorado, Illinois, Maryland, Massachusetts, New Jersey, and West Virginia markets.  The CC Group has substantially completed winding down its New York operations and is in the process of winding down its Pennsylvania operations.

c.  *Senior Noteholder Consent and Support Agreement*

34.     Throughout the Sale Process, the CC Group has engaged and consulted with Senior Noteholders to work collaboratively towards a value-maximizing sale and wind-down process for the benefit of all stakeholders.

35.     In connection with the commencement of the Canadian Proceeding, the Debtors entered into a support agreement (the "**Support Agreement**") with members of an ad hoc group of the Senior Noteholders that collectively hold approximately 60% of the Senior Notes (the "**Supporting Noteholders**").

36.     I believe that, absent the CC Group's constructive engagement with Senior Noteholders to obtain their support for the Sales and wind-down efforts, the Debtors and the rest of the CC Group likely would have run out of liquidity, defaulted under the A&R Indenture without the ability to obtain a forbearance, and been forced into a value-destructive foreclosure or liquidation process.  Instead, the CC Group have found going concern buyers for the vast majority of its operating assets at attractive values.  The Debtors now seek relief under the CCAA and title 11 of the United States Code (the "**Bankruptcy Code**") to protect this value-maximizing outcome for its stakeholders and provide for an orderly wind-down.  I believe that these proceedings, together, provide the requisite tools for completing those objectives in the most value-maximizing and efficient manner available.

RLF1 35570928v.1

## V.  Debtors' Property in the United States

37.  Each of the Debtors have property in the United States.  The Parent Company is the owner of 100% of the equity of Debtor Columbia Care, which is a ***Delaware*** limited liability company.  The Parent Company also has other property in the United States, including bank accounts.  Further, each of the Debtors have unearned portions of retainers provided to local counsel in Delaware.

## VI.  Debtors' Canadian COMI

38.  The Parent Company and The Cannabist Canada Company are each incorporated in and have registered office addresses located in Canada.

39.  In addition, the Parent Company is a publicly listed company in Canada (on the CBOE).  I understand that the Parent Company raised hundreds of millions of dollars for the benefit of the CC Group and its stakeholders through common stock offerings executed through Canadian agents in the Canadian capital markets.

40.  I understand that the terms of the Canadian-law governed A&R Indenture are publicly available to all creditors and equity holders.[4]  I understand that a sizable portion of the Senior Noteholders—approximately 37% of the principal value of the Senior Notes as of the CCAA Commencement Date—are domiciled in Canada.  Further, the financial results of the Debtors inform public investment in the Senior Notes and the Canadian Parent Company's Canadian-listed equity.

---

[4]  *See* The Cannabist Company Holdings Inc., Form 8-K (filed June 4, 2025), https://www.sec.gov/Archives/edgar/data/1776738/000110465925056402/tm2517085d1_8k.htm.

41.     The CBCA Restructuring Transaction that took place in 2025 through the Canadian Court was publicly disclosed by the Parent Company, with information available to all creditors of the Debtors and the CC Group, and supported by a majority of Senior Noteholders.[5]

42.     The Debtors' funded debt holders—the Senior Noteholders—overwhelmingly supported the commencement of the Canadian Proceeding.  The Supporting Noteholders party to the Support Agreement represent approximately 60% of the Senior Notes. The Support Agreement expressly contemplates the commencement of the Canadian Proceeding in the Canadian Court and the process conducted thereunder.  The Parent Company publicly announced the entry into the Support Agreement.[6]

43.     Finally, each of the Debtors have unearned portions of retainers provided to Canadian counsel in Canada.

## VII.    Relief Requested is Necessary

44.     I believe, after consultation with the CC Group's legal and financial advisors, that the relief requested in the Verified Petitions and the Provisional Relief Motion is necessary to maximize the value of the Debtors' estates for all stakeholders.  I believe the Canadian Proceeding is integral to completing the value-maximizing Sale Process and an efficient wind-down of the CC Group and is necessary to protect the Debtors and maximize value for their creditors and other stakeholders.  Beyond the financial harms to the Debtors and their creditors, business disruption poses a risk to the approximately 100,000 patients that rely on the CC Group

---

[5]    *See* The Cannabist Company Holdings Inc., Form 8-K (filed Feb. 27, 2025), https://www.sec.gov/Archives/edgar/data/1776738/000119312525038557/d860118d8k.htm.

[6]    *See* The Cannabist Company Holdings Inc., Form 8-K (filed Mar. 24, 2026), https://investors.cannabistcompany.com/news-releases/news-release-details/cannabist-company-announces-strategic-transactions-and-initiates.

14

RLF1 35570928v.1

for access to medicinal products and to the CC Group's 1,200 employees.  As such, I believe the enforcement of the relief obtained in the Canadian Proceeding is critical to ensure that parties in the United States do not circumvent such relief.  Time is of the essence to obtain that relief, and I believe that immediately obtaining the Provisional Relief is crucial to the success of the Canadian Proceeding and the Sale Process.

45.    Without the benefit of the stay of actions against the Debtors and Stay Parties,[7] including on an immediate, provisional basis, I believe that there is a real and significant risk that the underlying value of the Debtors' property interests (i.e., their cash and the equity interests in the Subsidiaries) will be harmed.  While the Debtors received certain protections staying the commencement of actions pursuant to the Initial Order, the Debtors are concerned that the CC Group may be immediately exposed to adverse action in the United States by certain creditors and other parties in interest that may disregard these protections.

46.    Thus, for the reasons set forth below (among others), without the Provisional Relief, the Debtors and the Stay Parties risk value destruction arising from such adverse action during the period between the date hereof and the date on which the Debtors can obtain an order granting the relief sought in the Recognition Motion.  These same concerns will continue for the remainder of the Chapter 15 Cases.  The Provisional Relief (and ultimately recognition) would ameliorate those concerns.

47.    *First*, the Debtors are concerned that, without enforcement of the stay provided in the Initial Order, the IRS could take enforcement action and exercise remedies against the CC Group for its asserted tax claims.  I believe that risk is real—not theoretical—as the IRS

---

[7]    "**Stay Parties**" means the Debtors and the other parties pursuant to which the stay in the Initial Order applies, as set forth in the Initial Order at ¶¶ 13 to 20, 26.

15

historically has not hesitated to exercise remedies, including asserting a lien on the Parent Company prior to the IRS Payment Plan and sending a notice of levy in respect of a bank account of the Parent Company when the Parent Company missed a payment under the IRS Payment Plan.

48.     *Second*, I am concerned that, if the Support Agreement was terminated, Senior Noteholders in the United States might seek to exercise remedies against the property of the Debtors and their Subsidiaries that guarantee the Senior Notes.

49.     *Third*, entities in the CC Group are party to approximately 70 leases and numerous material contracts.  Certain of those contracts and leases contain provisions that allow a counterparty to terminate upon non-payment of prepetition amounts, commencement of the Canadian Proceeding, financial condition of the CC Group party or guarantor, or all of the above. I believe, based on certain analyses prepared by the CC Group's advisors (with input from the CC Group's management team), if any of the leases are terminated, (a number of which the Parent Company guarantees), it would present a significant risk of disruption to the CC Group's operations and value-destruction.  Those leases, in my opinion, are paramount to realizing value-maximizing Sales through the Canadian Court-supervised Sale Process in the Canadian Proceeding.  Similar concerns exist with respect to material contracts.  Terminations of these agreements, especially during the early stages of these cases, would harm the Sale Process, through which the Debtors seek to maximize the value for stakeholders by selling the equity of Subsidiaries that hold such contracts or the contracts themselves in certain asset sales.

50.     *Fourth*, the Debtors' trade creditors and mortgagees could seek to pursue legal action or other remedies against the Debtors.  I am concerned any such actions against the Stay Parties to proceed during the pendency of the Canadian Proceeding, including during the

16

period before the Court can consider the Recognition Motion, would interfere with the closing of Sales and wind-down of the CC Group.

51.    *Fifth*, the CC Group transacts with hundreds of vendors in the course of its business, including, among others, software providers, pest control providers, and logistics providers.  I am concerned that such vendors may cease providing services on the basis of prepetition amounts owed, which risks harming the underlying value of the businesses the CC Group seeks to sell.

52.    I believe that if creditors are able to take the above actions (or any other adverse actions) against the Stay Parties, it would cause irreparable harm to the Debtors and their efforts to conduct a value-maximizing Sale Process and wind-down for the benefit of all stakeholders through the Canadian Proceeding.  Each of the above-described actions would distract the CC Group from focusing its efforts on the Sale Process, which I believe would frustrate its ability to complete the Sale Process in a value-maximizing manner.

53.    I also am informed that the Debtors have sought the Amended and Restated Initial Order authorizing the Debtors, and the Debtors' affiliates, officers, and directors to cease certain public reporting requirements.  Recognition of such relief will remove the burden of the expenses and time associated with such filings to provide a value-maximizing process.  I believe this is critical to allow the Debtors to administer the Canadian Proceeding most efficiently, as they will not be forced to divert financial and CC Group resources towards reporting that is ultimately moot given the CC Group intends to wind-down its remaining operations as a part of the Canadian Proceeding.  Moreover, I understand that the Parent Company does not intend to maintain its public listing because the CC Group intends to wind-down its remaining affairs following the completion of the Sales.

54.     For the reasons set forth above, I believe that the Provisional Relief and the relief requested in the Recognition Motion is necessary to protect the Debtors and the value-maximizing Sale Process and wind-down.

## VIII.   Statement Pursuant to Section 1515(c) of Bankruptcy Code

55.     I am informed by counsel that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

56.     In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that, to my knowledge, other than the Canadian Proceeding, I am not aware of any foreign proceedings (as such term is defined in section 101(23) of the Bankruptcy Code) currently pending with respect to any of the Debtors.

## IX.     Disclosures Pursuant to Bankruptcy Rule 1007(a)(4)

57.     I am informed that, pursuant to the Initial Order, the Canadian Court appointed the Parent Company as "foreign representative" for the purposes of applying for recognition and approval of the Canadian Proceeding in any jurisdiction outside of Canada, including by commencing the Chapter 15 Cases.  The Initial Order authorizes the Foreign Representative to apply for foreign recognition and approval of the Canadian Proceeding in the United States pursuant to chapter 15 of the Bankruptcy Code.  I am not aware of any other persons or bodies authorized to administer foreign proceedings for the Debtors.

58.     I am also informed by counsel that Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") provides that a foreign representative filing a petition for recognition under chapter 15 of the Bankruptcy Code shall file with such petition: (i) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1 (the "**Corporate Ownership Statement**"); and (ii) unless the court orders otherwise, lists

18

containing (a) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, (b) all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and (c) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code.  In accordance with Bankruptcy Rule 1007(a)(4), I hereby provide the following information:

 a.  *Corporate Ownership Statement*

59. The Corporate Ownership Statement is annexed to the Chapter 15 Petitions as <u>Exhibit 3</u> and is incorporated herein by reference.

 b.  *Pending Litigation*

60. I am aware of certain litigation in the United States and Canada which involves the Debtors.  A schedule of such litigation is annexed to the petitions as <u>Exhibit 4</u> and is incorporated herein by reference.

### **Conclusion**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 25th day of March, 2026.

St. Louis, Missouri

*/s/ Curt Kroll*
Curt Kroll

RLF1 35570928v.1