**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
                                                                :
In re:                                                          :        **Chapter 15**
                                                                :
**THE CANNABIST COMPANY**                                       :        **Case No. 26–10426 (BLS)**
**HOLDINGS INC.,** *et al.,*                                    :        **(Jointly Administered)**
                                                                :
        **Debtors in a Foreign Proceeding.**[1]                 :
                                                                :        **Hearing Date: May 12, 2026, 2:00 PM**
---------------------------------------------------------------- x        **Re:  Docket Nos. 5, 72**

**DEBTORS' REPLY IN SUPPORT OF MOTION FOR RECOGNITION OF FOREIGN**
**PROCEEDING AND REQUEST FOR CERTAIN RELATED RELIEF**

The Cannabist Company Holdings Inc. (the "**Parent Company**"), in its capacity as

the duly appointed foreign representative of the Parent Company and its debtor affiliate The

Cannabist Company Holdings (Canada) Inc. (collectively, the "**Debtors**"), which are the subject

of a proceeding (the "**Canadian Proceeding**") currently pending in the Ontario Superior Court of

Justice (Commercial List) (the "**Canadian Court**"), files this reply in support of its *Motion for*

*Recognition of Foreign Proceeding and Request for Certain Related Relief* [D.I. 5]

(the "**Recognition Motion**") and in response to East West Bank's *Objection to Motion for*

*Recognition of Foreign Proceeding and Request for Certain Related Relief* [D.I. 72]

(the "**Objection**").[2]   In support of this reply, the Foreign Representative relies upon the (i)

*Supplemental Declaration of Curt Kroll in Support of Motion for Recognition of Foreign*

---

[1]   The Debtors in the Chapter 15 Cases, together with the last four digits of their federal tax identification number or Canadian business number, as applicable, are: (i) The Cannabist Company Holdings Inc. (8978) and (ii) The Cannabist Company Holdings (Canada) Inc. (9428).  The location of the Parent Company's registered office and the Debtors' service address is: 666 Burrard St #1700, Vancouver, British Columbia V6C 2X8, Canada. Additional information may be obtained on the website of the Debtors' information agent at https://www.veritaglobal.net/CCGroup.

[2]   Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Recognition Motion.

*Proceeding and Request for Certain Related Relief* (the "**Supplemental CRO Declaration**") and (ii) *Supplemental Declaration of Lee Nicholson as Canadian Counsel to the Debtors in Support of Debtors' Motion for Recognition of Foreign Proceeding and Certain Related Relief* (the "**Supplemental Nicholson Declaration**"), each filed contemporaneously herewith and incorporated herein by reference.

## PRELIMINARY STATEMENT

1.       The Debtors have satisfied all of the requirements for recognition of their foreign bankruptcy proceedings under chapter 15 of the Bankruptcy Code.   Accordingly, recognition is mandatory, and this Court should order appropriate relief to effectuate that recognition.

2.       East West Bank ("**EWB**"), and EWB alone, objects to recognition.  Not a single one of the Debtors' other creditors, and not any other party in interest, disputed that recognition is appropriate.[3]  And for good reason: Canadian bankruptcy proceedings are routinely recognized under chapter 15 by this Court and many others, and the relief the Debtors seek here is perfectly in keeping with relief this Court and many others have granted in past cases.

3.       EWB's primary argument is that the relief the Debtors seek is "manifestly contrary to the public policy of the United States" because the Parent Company indirectly owns subsidiaries that sell cannabis.  As EWB sees it, because the United States has laws on the books prohibiting the use and sale of cannabis—even though (i) the United States generally does not enforce those laws against state-legal cannabis businesses, (ii) both Canada and the U.S. states in which the subsidiaries operate have authorized the use and sale of cannabis, and (iii) the Acting

---

[3]   The Debtors agreed to incorporate certain informal comments from the Office of the United States Trustee (the "**U.S. Trustee**") to the proposed order granting the Recognition Motion and contemporaneously herewith have filed a revised form of order (the "**Proposed Recognition Order**").  *See* D.I. 75.

Attorney General of the United States recently executed an order rescheduling cannabis—it would manifestly contradict United States public policy to recognize Canadian judgments reflecting the lawful Canadian wind-down of Canadian holding companies.  EWB takes this position even though it has voluntarily banked the Debtors and issued loans to the Debtors' affiliates while knowing that the affiliates were engaged in the cannabis business.  Notably, no component of the United States government objected to recognition on this ground (or any other).

4.    Section 1506 imposes an exceedingly high standard that requires, as the statutory text suggests, extraordinary interference with American domestic policy for the Court to even consider exercising its discretion to deny recognition.  Instances where American courts have invoked section 1506 to deny relief are few and far between.  Indeed, the Foreign Representative is aware of only six reported decisions where relief has been denied on that basis out of the several thousand cases filed in chapter 15's twenty-one-year history.[4]  There is no good reason this case should join that narrow set of outliers.

5.    The few cases invoking section 1506 do so where *the foreign proceeding itself* compromises core rights of Americans—such as where the foreign proceeding violates constitutional due process guarantees or orders the invasion of an individual's fundamental right to privacy.  That is not the case here, as American courts routinely recognize Canadian bankruptcy proceedings without hesitation.  It would frustrate the chapter 15 process and undermine fundamental comity interests to invalidate a lawfully obtained foreign judgment facilitating an

---

[4]    These six cases reflect approximately 0.2% of all chapter 15 petitions that have been filed.  *See* U.S. Courts, *Bankruptcy Statistics Data Visualizations*, https://www.uscourts.gov/data-news/reports/statistical-reports/bankruptcy-filing-statistics/bankruptcy-statistics-data-visualizations (showing that 2,416 chapter 15 cases were filed between January 1, 2008, and December 31, 2025).

insolvency proceeding that is otherwise entitled to recognition simply due to the nature of the debtor's business.[5] Because section 1506 is not implicated, this Court must grant recognition.

6.      EWB also argues that this Court should not enforce certain relief already awarded in the Canadian Proceeding (and which this Court awarded on a provisional basis), including extending a stay to the Debtors' non-debtor subsidiaries through May 29, 2026 (subject to further extension if authorized by the Canadian Court).  But courts routinely conclude that chapter 15 authorizes such relief, and both statutory language and context support this result. Indeed, courts have consistently authorized third-party releases of non-debtors under chapter 15, so the comparatively modest relief of extending a short-term stay to a debtor's subsidiaries is clearly appropriate.

7.      Notwithstanding the due process and opportunities to object offered in Canada, EWB seeks to evade the Canadian Proceeding and Canadian Court's orders by challenging recognition here.  EWB offers no good reason to undermine the Canadian Court's reasoning for approving the stay, which EWB did not object to in the Canadian Proceeding even though EWB had notice of the hearing at which it was approved and appeared with Canadian counsel in the Canadian Proceeding.[6]

8.      As the Foreign Representative has explained, a stay with respect to non-debtor affiliates is practically necessary in order to ensure the uninterrupted operation of the Debtors' businesses and protect the value of the Debtors' subsidiaries, which will maximize value for the Debtors' creditors, who have claims against both the Debtors and their subsidiaries (collectively, the "**CC Group**").  By contrast, EWB's approach would invite a value-destructive

---

[5]    EWB's argument that any involvement in the cannabis industry taints the Debtors' efforts to seek relief is especially perplexing, given that EWB *itself* has provided financial services to the cannabis businesses at issue here for years and has regularly made loans to and banks other businesses in the industry.

[6]    *See* Supplemental Nicholson Declaration ¶¶ 5–6.

race to the courthouse and would deny the Debtors' creditors the orderly and fair process contemplated by the Canadian Proceeding and chapter 15. Enforcement of the stay imposed by the Canadian Court is particularly critical here because EWB has already violated that stay on more than one occasion by freezing the Debtors' operating bank accounts. Denying recognition poses the risk that EWB or another party would do so again, as well as commence value-destructive enforcement actions against the operations at the properties they have mortgages on.

**ARGUMENT**

**I.  The petitions meet all the requirements of chapter 15.**

9.    Under section 1517(a) of the Bankruptcy Code, "an order recognizing a foreign proceeding *shall* be entered if … (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding …; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a) (emphasis added). This provision makes recognition mandatory ("shall") where these three elements are satisfied.

10.   Each of these elements is met here and EWB does not argue otherwise. *First*, there is no dispute that the Canadian Proceeding is a foreign main proceeding, as the Debtors are Canadian entities. *Second*, the foreign representative applying for recognition is the Parent Company, which is a duly appointed body authorized to apply for recognition. *Third*, the petitions meet each of the requirements of section 1515: the petitions were accompanied by a certified copy of the decision commencing the Canadian Proceeding and by a statement identifying all foreign proceedings with respect to the Debtors. *See* 11 U.S.C. § 1515(b)(1), (c); D.I. 1.

11.   Because section 1517(a)'s three requirements are met, recognition of the Canadian Proceeding is mandatory. EWB is wrong to suggest that comity in the recognition context operates on a case-by-case basis, that courts have discretion to "withhold comity" when

they conclude that doing so would be prejudicial, or that "'comity does not achieve the force of an imperative or obligation.'"  Objection at 6 (citation omitted).  The text of section 1517(a) unambiguously provides that recognition is mandatory:  If the section's three requirements are met, "an order recognizing a foreign proceeding *shall* be entered."  11 U.S.C. § 1517(a) (emphasis added).  The decades-old cases EWB cites for the proposition that comity is discretionary have nothing to do with chapter 15 recognition, or with the bankruptcy system at all, and turn on entirely different legal authorities.  *See Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 439–40 (3d Cir. 1971) (diversity action to effectuate English judgment enforcing "alleged contract to peddle Tarzan chewing gum in England"); *Diorinou v. Mezitis*, 237 F.3d 133, 143 (2d Cir. 2001) (application of the Hague Convention to Greek decisions regarding a mother's custody over her children).

**II.  Section 1506's stringent standard for denying recognition is not met here.**

12.    EWB argues that the Court should decline to recognize the Canadian Proceeding under section 1506 of the Bankruptcy Code, which provides that "[n]othing in [chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.

13.    This provision sets a very high bar for court discretionary intervention.  It requires an objector to first meet the steep standard of showing that the relief sought under chapter 15 is "manifestly contrary" to United States public policy.  It then authorizes courts to exercise their discretion to refuse to take such action; but it does not require courts to do so.[7]

---

[7]    In this respect, the provision differs from section 1517, which makes recognition mandatory, or the dismissal requirements in chapter 11 (which courts have cited to in dismissing cannabis-related chapter 11 cases), which provide that the court "*shall* convert … or dismiss a case" for cause.  11 U.S.C. § 1112(b)(1) (emphasis added).

14.     Here, EWB's objection fails at the first step, as the steep standard imposed by section 1506 is not met. There is thus no basis for this Court to deny recognition and no room for discretion. Recognizing the Canadian Proceeding here and the relief entered by the Canadian Court would be *consistent* with, not manifestly contrary to, American public policy.

      *a. Section 1506 can apply only where the foreign proceeding is not procedurally fair or where recognition would impinge severely on constitutional or statutory rights.*

15.     As courts regularly recognize, section 1506 "is only intended to be invoked under exceptional circumstances." *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 309 (3d Cir. 2013) (citation omitted); *see also In re Ran*, 607 F.3d 1017, 1021 (5th Cir. 2010) (this "narrow public policy exception" is "intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States"); *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 139 (2d Cir. 2013) (similar).

16.     To that end, the Third Circuit has noted that the "public policy exception" of section 1506 applies in only two circumstances: "'[1] where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections' or [2] where recognition 'would impinge severely a U.S. constitutional or statutory right.'" *ABC Learning Centres*, 728 F.3d at 309 (citation omitted).

17.     The text of section 1506 confirms that the scope of bankruptcy court discretion to deny recognition is exceedingly narrow. Section 1506 applies only to actions that are "manifestly contrary to the public policy of the United States." "Manifest" means "[e]vident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident." Black's Law Dictionary 962 (6th ed. 1990); *see also* Webster's Third New International Dictionary (1985) (defining "manifest" as "to show plainly or make palpably

7

evident or certain"). Thus, it must be "unmistakable" or "self-evident" that the action in question is contrary to American public policy. As the Third Circuit has noted, "[t]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." *ABC Learning Centres*, 728 F.3d at 309 (citation omitted).

18.    Section 1506 is taken nearly verbatim from Article 6 of the UNCITRAL Model Law on Cross-Border Insolvency. That provision "has been *narrowly interpreted on a consistent basis in courts around the world*." *Fairfield Sentry*, 714 F.3d at 139 (citation omitted). This consistent interpretation is of particular significance here, because section 1508 provides that, "[i]n interpreting [chapter 15], the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.

19.    Reflecting this steep standard, the Foreign Representative is aware of only six reported decisions where U.S. courts have applied section 1506 to deny relief under chapter 15, not one of which involved a Canadian proceeding. In none of these cases did the court deny relief because of the nature of the debtor's business. Instead, in each case, the court denied relief because the foreign proceeding itself was procedurally unfair or seriously infringed on an individual's fundamental rights under American law.[8]

20.    In two of the cases, bankruptcy courts declined to order relief under chapter 15 where doing so would deprive individuals of property without notice and an opportunity

---

[8]    In another case, a bankruptcy court held that a provision allowing for non-consensual third-party releases was manifestly contrary to public policy. *See In re Vitro, S.A.B. de C.V.*, 473 B.R. 117, 132 (Bankr. N.D. Tex. 2012). On appeal, however, the Fifth Circuit upheld the order on other grounds and expressly reserved any decision on the section 1506 question, while casting doubt on the bankruptcy court's reasoning. *See In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1069–70 (5th Cir. 2012) ("[Section] 1506 was intended to be read narrowly, a fact that does not sit well with the bankruptcy court's broad description of the fundamental policy at stake as 'the protection of third party claims in a bankruptcy case.'" (quoting *Vitro*, 473 B.R. at 132)). As explained below, *see infra*, at 10–11, more recent cases—including from this Court—consistently hold that recognizing third-party releases granted in foreign bankruptcy proceedings does not implicate section 1506.

for a hearing in violation of the due process promised by the U.S. Constitution.  *See In re Nexgenesis Holdings Ltda.*, 662 B.R. 406, 419 (Bankr. S.D. Fla. 2024) (proposed relief would freeze assets of U.S. citizens without a pre-deprivation adjudication); *In re Sivec SRL*, No. 11-80799 (TRC), 2011 WL 3651250, at *3 (Bankr. E.D. Okla. Aug. 18, 2011) (proposed relief would mandate the turnover of funds).  In two other cases, bankruptcy courts declined to award relief that would violate fundamental privacy rights guaranteed by federal statutory law (and, potentially, the Fourth Amendment) by intercepting private communications.  *See In re Toft*, 453 B.R. 186, 197–98 (Bankr. S.D.N.Y. 2011) (proposed relief would allow the unlawful interception of mail and email); *In re Irish Bank Resol. Corp. Ltd.*, 559 B.R. 627, 648, 653 (Bankr. D. Del. 2016) (proposed relief would require e-mail service provider to unlawfully turn over electronically stored information regarding an individual's past and future e-mail correspondence).  And, in the last two cases, bankruptcy courts declined to award relief where the proposed order would "severely impinge" on statutory rights guaranteed by the Bankruptcy Code itself.  *In re Qimonda AG*, 462 B.R. 165, 178–79, 183 (Bankr. E.D. Va. 2011) (citation omitted), *aff'd on other grounds sub nom. Jaffe v. Samsung Elec. Co., Ltd.*, 737 F.3d 14 (4th Cir. 2013); *see id.* (proposed relief would allow foreign debtors to reject license agreements without protections guaranteed to American licensees under section 365(n)); *In re Gold & Honey, Ltd.*, 410 B.R. 357, 371–72 (Bankr. E.D.N.Y. 2009) (proposed relief would allow violation of automatic stay in separately pending chapter 11 proceeding).

21.    All of these cases focused on the nature and effect of the foreign proceeding itself.  Not one of these cases focused on the nature of the debtor's underlying business.  And appropriately so, as the debtor's business has no relevance to the procedural fairness of the foreign proceedings or the significant comity interest in respecting those proceedings.

22.     To that end, courts recognize foreign proceedings in a broad range of circumstances even when the relief sought "differ[s] from U.S. law in certain respects," provided that the relevant country's "bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence." *In re Rede Energia S.A.*, 515 B.R. 69, 98, 104 (Bankr. S.D.N.Y. 2014).

23.     As the Ninth Circuit Bankruptcy Appellate Panel has recognized, differences between American law and foreign law are no reason to deny recognition: "If a foreign statute gives the right, the mere fact that we do not give a like right is no reason for refusing to help the [party] in getting what belongs to him.  We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home." *In re Black Gold S.A.R.L.*, 635 B.R. 517, 532 (B.A.P. 9th Cir. 2022) (quoting *Loucks v. Standard Oil Co.*, 120 N.E. 198, 201 (N.Y. 1918) (Cardozo, J.)).

24.     For example, the United States Supreme Court has held that nonconsensual third-party releases are forbidden under chapter 11.  *See Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 226 (2024).   Yet this Court has enforced nonconsensual third-party releases under chapter 15 where they are "customary and permitted" under foreign law. *In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.*, 670 B.R. 150, 172 (Bankr. D. Del. 2025), *aff'd*, No. 25-00371 (CFC), 2026 WL 881444 (D. Del. Mar. 31, 2026).   Indeed, the District Court recently affirmed this decision and, in so doing, emphasized section 1506's exceedingly narrow scope:  The "public policy exception provides a *narrow remedy* for *genuine threats* to core U.S. constitutional or statutory rights, as opposed to mere discrepancies between domestic and foreign law." *Crédito Real*, 2026 WL 881444, at *8 (emphasis added).  The Bankruptcy Court of the Southern District of New York likewise recently explained that the "narrowly construed" public policy exception

does not apply to nonconsensual third-party releases. *In re Odebrecht Engenharia e Construção S.A. – Em Recuperação Judicial*, 669 B.R. 457, 474 (Bankr. S.D.N.Y. 2025). As that court explained, where "both sides of [the] policy debate may have their points," section 1506 cannot apply. *Id.* (quoting *Purdue*, 603 U.S. at 226); *see also In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 697–98 (Bankr. S.D.N.Y. 2010) (finding third-party releases are not barred by section 1506). Bankruptcy courts have similarly recognized foreign proceedings even where they do not provide the public with the access to court records or the jury trial right afforded by American law. *See, e.g.*, *Fairfield Sentry*, 714 F.3d at 139–40; *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006).

25.    In fact, a bankruptcy court has previously recognized a foreign proceeding under chapter 15 that was used, as is the case here, to facilitate the exit of a foreign company from a business that was illegal under U.S. federal law. In *In re Betcorp Ltd.*, the Bankruptcy Court for the District of Nevada granted recognition of a proceeding that involved an Australian online gambling company that had shut down after its business became illegal in the United States following enactment of the federal Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361–67. *See* 400 B.R. 266, 271, 273 (Bankr. D. Nev. 2009).

> b. *The Canadian Proceeding is procedurally fair, and EWB cannot show that recognition of the Canadian Proceeding would severely impinge on any fundamental individual rights under United States law.*

26.    Recognition of the Canadian Proceeding will facilitate the value-preserving and value-maximizing wind-down of the Debtors and their subsidiaries. Giving effect to foreign judgments that were entered in Canada to allow this process to play out is entirely consistent with American policy and furthers the purposes of chapter 15.

27.    Recognition here would not implicate either of the two contexts in which the Third Circuit has held that section 1506 may be applied.

11

28.     First, "the procedural fairness" of the Canadian Proceeding is not in doubt. *ABC Learning Centres*, 728 F.3d at 309 (citation omitted).  After all, "U.S. federal courts"— including this Court—"have repeatedly granted comity to Canadian proceedings." *Metcalfe*, 421 B.R. at 698; *see, e.g.*, *In re Contract Pharmaceuticals Ltd.*, No. 24-10915 (BLS) (Bankr. D. Del. May 28, 2024), D.I. 26; *see generally* Mar. 26, 2026 Hearing Tr. at 31:15–16, D.I. 39 ("This Court is certainly very, very familiar with the proceedings up in Canada.").[9]  Canada "share[s] the same common law traditions and fundamental principles of law" as the United States and "afford[s] creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process." *Metcalfe*, 421 B.R. at 698.

29.     Second, EWB does not identify any way in which recognition here "would impinge severely a U.S. constitutional or statutory right." *ABC Learning Centres*, 728 F.3d at 309 (citation omitted).  EWB argues that recognition should be denied because "[t]he Canadian Proceeding and Chapter 15 Proceeding are designed to facilitate the continued operation, sale, and liquidation of cannabis assets and distribution of the resulting proceeds." Objection at 7.  EWB argues that, because such actions are prohibited by (unenforced) federal law under the Controlled Substances Act, which prohibits the distribution and sale of marijuana (even though they are legal under applicable state law), granting recognition would severely impinge a U.S. statutory right. *See* 21 U.S.C. § 841(a).

---

[9]   *See also, e.g.*, *In re Goli Nutrition Inc.*, No. 24-10438 (LSS) (Bankr. D. Del. Apr. 18, 2024), D.I. 85; *In re Acerus Pharma. Corp.*, No. 23-10111 (TMH) (Bankr. D. Del. June 13, 2023), D.I. 78; *In re VBI Vaccines (Delaware) Inc.*, No. 24-11623 (BLS) (Bankr. D. Del. Aug. 27, 2024), D.I. 24; *In re Motorcycle Tires & Accessories LLC*, No. 19-12706 (KBO) (Bankr. D. Del. Jan. 22, 2020), D.I. 38; *In re Kraus Carpet Inc.*, No. 18-12057 (KG) (Bankr. D. Del. Oct. 1, 2018), D.I. 46; *In re NextPoint Fin. Inc.*, No. 23-10983 (TMH) (Bankr. D. Del. Aug. 16, 2023), D.I. 54; *In re Spectra Premium Indus Inc.*, No. 20-10611 (BLS) (Bankr. D. Del. May 29, 2020) (BLS), D.I. 80.

12

30.     But the mere fact that such activities are prohibited by federal law does not mean that they infringe a "statutory *right*" for the purposes of section 1506. *ABC Learning Centres*, 728 F.3d at 309 (emphasis added). In each of the cases cited by EWB, the specific order in question would have violated the rights of an individual or business protected by American law. *See* Objection at 7; *Irish Bank*, 559 B.R. at 632 (order would compel Yahoo! to turn over information from private email accounts in violation of the user's rights under the Stored Communications Act); *Vitro*, 473 B.R. at 132 (order granting recognition would extinguish third-party claims against non-debtors); *Toft*, 453 B.R. at 189 (order would have permitted foreign representative to access debtor's email account in violation of the debtor's rights under the Stored Communications Act); *Gold & Honey*, 410 B.R. at 371 (recognition order would authorize entity to violate automatic stay in separate chapter 11 proceeding). None of these cases suggests that "a violation of United States federal law" standing alone can satisfy section 1506, Objection at 7, and the cases instead require that the foreign proceeding itself "impinge severely a U.S. constitutional or statutory right," *ABC Learning Centres*, 728 F.3d at 309 (citation omitted).

31.     EWB does not identify any case that has applied section 1506 to deny recognition simply because of disapproval of a debtor's business. As discussed above, no such case exists. And EWB does not identify *any* doctrinal framework set forth by *any* court under which section 1506 may be applied to bar recognition and override the principles of comity chapter 15 embodies due to the character or legality of the debtor's business. As bankruptcy courts have consistently held, even "a party's misconduct or 'bad faith,' standing alone, is not a proper basis for invoking the public policy exception in section 1506 to deny recognition." *Black Gold*, 635 B.R. at 531; *see generally In re Culligan Ltd.*, No. 20-12192 (JLG), 2021 WL 2787926, at *13–16 (Bankr. S.D.N.Y. July 2, 2021) ("[C]ourts have generally found that section 1506 does not

prohibit recognition in situations where the debtor has engaged in bad faith."); *compare* 11 U.S.C. § 1112(b)(1) (authorizing courts to dismiss chapter 11 cases for cause).  Even when confronted with "'the most blatant effort to hinder, delay and defraud a creditor [a court] has ever seen,'" bankruptcy courts have granted recognition under chapter 15 given "the mandatory nature of recognition and the high bar for invoking [section] 1506." *Black Gold*, 635 B.R. at 529 (quoting *In re Creative Finance, Ltd.*, 543 B.R. 498, 502 (Bankr. S.D.N.Y. 2016)).

32.    Importantly, section 1506 focuses squarely on the specific "action" the court is being asked to take and asks only whether "*the action* would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506 (emphasis added).  This unambiguously narrow compass requires that the Court consider only the specific relief requested and the action the United States court is asked to take, not any subsidiary or ancillary aspects of the debtor's business.

33.    Here, the sole purpose of the Canadian Proceeding is to allow for a value-maximizing wind-down of holding companies that do not themselves directly grow, sell, or handle cannabis.  The entities affiliated with the Debtors that do engage in such activities are not debtors either in this proceeding or in the Canadian Proceeding.  And, in any event, those subsidiaries' business—including the sale of cannabis—is fully legal under both Canadian law and state law in all of the states in the United States in which they operate. [10]  The proposed relief here would facilitate the value-maximizing divestment of equity in and assets of operating subsidiaries in an orderly fashion.  Some of these divestments have already been approved by the Canadian Court in the Canadian Proceeding.

---

[10]    *See Declaration of Curt Kroll in Support of Motions for (I) Provisional Relief and (II) Recognition of Foreign Proceeding and Request for Certain Related Relief*, D.I. 6, at ¶ 10.

14

34.     In other contexts, federal courts enforce contracts and other legal obligations relating to cannabis businesses.  "[I]t is not the law that federal courts cannot hear or resolve disputes arising from cannabis companies." *One Triple Two, LLC v. Divel*, No. 22-2027 (BAH), 2024 WL 2155058, at *5 (D. Md. May 13, 2024).  For instance, federal courts have held that cannabis companies are entitled to enforce contracts relating to the sale of their business. *See id.*  Where "[t]he contract at issue … is not a contract for the sale of cannabis" but instead "a contract for the sale of a business … and the assets of [a] business," there is no basis for denying relief that "does not require any violation of federal law" but "merely requires payment from one party to another." *Id.*  So, too, federal courts have enforced notes issued by cannabis businesses, *see Ginsburg v. ICC Holdings, LLC*, No. 16-02311 (SAF), 2017 WL 5467688, at *8 (N.D. Tex. Nov. 13, 2017); contracts to insure marijuana products, *see Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co.*, 163 F. Supp. 3d 821, 835 (D. Colo. 2016); and agreements transferring stock between cannabis businesses, *see Kush, Inc. v. Van Vranken*, No. 20-00649 (JCM), 2020 WL 8371452, at *5 (D. Nev. June 19, 2020).  Similarly, federal courts regularly enforce the rights of other individuals against cannabis companies.[11]  The mere fact that a case involves a cannabis company does not require a federal court to refuse to act.

35.     The relief sought in the chapter 15 proceedings here is even more remote from cannabis than in any of these examples, as it involves only the recognition of a lawful foreign proceeding where none of the applicants in that proceeding are themselves licensed entities engaged in selling cannabis.  EWB emphasizes that the relief ordered by the Canadian Court reaches the Parent Company's plant-touching subsidiaries, but this is of no moment.  Such relief

---

[11]   *See, e.g.*, *Kenney v. Helix TCS, Inc.*, 939 F.3d 1106, 1112–13 (10th Cir. 2019) (Fair Labor Standards Act); *Smith v. 116 S Mkt. LLC*, 831 F. App'x 355, 356 (9th Cir. 2020) (Americans with Disabilities Act); *Aichele v. Blue Elephant Holdings, LLC*, 292 F. Supp. 3d 1104, 1112 (D. Or. 2017) (Title VII of the Civil Rights Act).

is, at worst, analogous to the many cases cited above in which federal courts resolved disputes and enforced orders involving cannabis companies. Indeed, the relief sought here is much more consonant with U.S. public policy than those cases, as recognition would respect the legitimate orders of the Canadian Court and would protect U.S. creditors from the exercise of value-destructive remedies by numerous creditors or the race to the courthouse that might occur in state court if recognition is denied. Granting recognition is certainly not contrary to fundamental United States public policy, which is the only basis under which chapter 15 allows (yet does not require) the Court to refuse to enforce legitimate orders entered by the courts of a foreign sovereign.

   c. *Even if the nature of the Debtors' businesses were relevant, enforcing the Canadian judgments does not violate fundamental U.S. public policy.*

36. Even were it a relevant consideration, the current (and rapidly advancing) status of cannabis legalization in the United States and the normalization of the cannabis industry make EWB's argument particularly weak.

37. The sale of cannabis is fully legal in all of the states in which the Parent Company's U.S. subsidiaries operate. Currently, 47 states and the District of Columbia have legalized the medicinal use of cannabis.[12] Further, 24 states and the District of Columbia have legalized the recreational use of cannabis.[13]

38. Almost 15,000 businesses, with hundreds of thousands of employees, sell cannabis to members of the public.[14] These entities participate in an economically significant and

---

[12] *See* Centers for Disease Control and Prevention, *State Medical Cannabis Laws* (Feb. 16, 2024), https://www.cdc.gov/cannabis/about/state-medical-cannabis-laws.html.

[13] *See* David A. Lieb, *What to know about Trump's order seeking to relax federal drug policies for marijuana*, AP News (Dec. 18, 2025), https://apnews.com/article/ab2aec5865dd140bac00b7cef5de89c5.

[14] *See* Athena Chapekis & Sono Shah, *Most Americans Now Live in a Legal Marijuana State – and Most Have at Least One Dispensary in Their County*, Pew Research Center (Feb. 29, 2024), https://www.pewresearch.org/short-reads/2024/02/29/most-americans-now-live-in-a-legal-marijuana-state-and-most-have-at-least-one-dispensary-in-their-county/.

well-established cannabis industry, which now generates "roughly $31 billion in annual legal cannabis sales," which is "equivalent to half the size of the U.S. liquor market."[15] These companies secure financing from reputable financial institutions (including EWB), are subject to robust state-level regulatory oversight, and pay billions of dollars in state and federal taxes each year.

39.    Many of these businesses provide cannabis products that offer critical relief to the thousands of Americans whose doctors prescribe marijuana for medical use, including to treat chronic pain, Alzheimer's disease, and other conditions.  According to the White House, "more than 30,000 licensed healthcare practitioners across 43 United States jurisdictions are authorized to recommend the medical use of marijuana for more than 6 million registered patients to treat at least 15 medical conditions." Exec. Order No. 14370, 90 Fed. Reg. 60,541 (Dec. 18, 2025).

40.    This industry persists without enforcement of the federal Controlled Substances Act against these firms pursuant to an established policy of non-enforcement by the federal government.  Far from reflecting strong U.S. public policy, the federal government's accommodation of the state-legal cannabis industry appears to reflect a policy of benign neglect, if not outright support.  As noted, the federal government has not objected to recognition in this proceeding.[16]

41.    The federal government's policy of non-enforcement is not merely customary; it has been enacted into law.  Congress has repeatedly barred the Department of Justice from using federal funds "to prevent" states "from implementing their own laws that authorize the

---

[15]    *See* Carol Ryan, *Marijuana Industry Could Stay in Limbo Under Trump*, The Wall Street Journal (Nov. 22, 2024), https://www.wsj.com/finance/investing/marijuana-cannabis-industry-trump-presidency-826e37ab.

[16]    The chapter 15 petition and Recognition Motion were served on the U.S. Trustee, the U.S. Attorney for the District of Delaware, the Internal Revenue Service, and the Securities and Exchange Commission, none of whom objected to the Recognition Motion.

use, distribution, possession, or cultivation of medical marijuana." *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 174 (2024).

42.      The Executive Branch has also recently taken steps to further normalize the legal status of cannabis under federal law.  On April 23, 2026, the Acting Attorney General issued a final order rescheduling medical cannabis products from Schedule I of the Controlled Substances Act to Schedule III.  *See* Schedules of Controlled Substances: Rescheduling of Food and Drug Administration Approved Products Containing Marijuana From Schedule I to Schedule III; Corresponding Change to Permit Requirements, 91 Fed. Reg. 22,714.  The order applies not only to cannabis that is used in drugs that have been approved by the FDA but also to any cannabis products that are subject to a state license for medical use.  *Id.* at 22,714–15.

43.      The order, moreover, expressly *endorses* the state-level cannabis industry, explaining that "incorporating state licensing systems into the federal registration framework represents the most effective and efficient means of achieving the CSA's objectives with respect to medical marijuana while promoting the medical benefits of marijuana and causing the least disruption for patients and existing state systems." *Id.* at 22,720.  As such, state licensing regimes "demonstrate a *sustained capacity to achieve the public-interest objectives that underlie the CSA's registration framework*." *Id.* (emphasis added).  And the rescheduling significantly impacts the treatment of covered businesses in the state-legal cannabis industry under the Tax Code as well by allowing such businesses to deduct their business expenses.  *See* 26 U.S.C. § 280E.[17]

44.      As the Executive Branch's own decisions make clear, the debate over state-legal marijuana is one where "both sides … may have their points," *Odebrecht*, 669 B.R. at 474

---

[17]    The Drug Enforcement Administration will hold an administrative hearing beginning on June 29, 2026, concerning the proposed rescheduling of cannabis for all uses—including non-medicinal cannabis —from Schedule I to Schedule III.  *See* Schedules of Controlled Substances: Rescheduling of Marijuana, 91 Fed. Reg. 22,777 (Apr. 28, 2026).

(quoting *Purdue*, 603 U.S. at 226)—though the inescapable trend is towards the normalization of recreational cannabis at both the state and federal levels.  This is the opposite of the expression of a fundamental public policy.  To the extent the United States has any public policy with respect to the state-legal cannabis industry, it is to allow it to continue to flourish.

45.     Even if EWB could conceivably show that the possible future enforcement of the Controlled Substances Act against firms participating in the state-legal cannabis industry reflects a fundamental United States public policy, facilitating the wind-down of a Canadian holding company by recognizing legitimate proceedings overseen by the courts of a sister sovereign is hardly "manifestly contrary" to any such policy.

46.     EWB's own role in this case reflects the increasingly normalized status of state-legal cannabis businesses and EWB's own acquiescence in the CC Group's operations.  As EWB details in its Objection, EWB has provided banking services to the affiliate entities at issue here for years, including providing tens of millions of dollars in mortgages to three separate entities in New York, New Jersey, and Maryland.  *See* Objection at 2–5.  Only now that EWB must contend with the bankruptcy system does EWB argue that legal proceedings involving these businesses are manifestly contrary to American public policy.

47.     Moreover, as EWB makes clear in its Objection, EWB is currently seeking to pursue "collection actions," presumably judicial foreclosure proceedings in state court.  Objection at 13.  EWB clearly has no principled objection to judicial proceedings that involve cannabis businesses—even though state courts, just like federal courts, are obligated to follow federal law.  *See* U.S. Const. art. VI, cl. 2.  Far from seeking to vindicate U.S. public policy, EWB apparently seeks only to advantage itself in a race to the state courthouse and avoid the Canadian Court-ordered stay and the orderly process established under Canadian law and U.S. federal law

19

to protect the interests of all of the Debtors' creditors.  Rejecting EWB's efforts at forum shopping and line-jumping in favor of recognizing a sister sovereign's lawful and fair judgment would not be manifestly contrary to United States public policy—it would advance the policy.

> d.   *Cases applying different standards under different chapters of the Bankruptcy Code are not relevant under chapter 15.*

48.      EWB cites to cases that have denied relief to cannabis businesses under other chapters of the Bankruptcy Code.  That body of law is irrelevant here, because it relies on provisions of the Bankruptcy Code that do not apply in chapter 15.

49.      EWB suggests that there is some general rule that "debtors who operate businesses in violation of the CSA are not entitled to relief under the Bankruptcy Code," and that "nothing in Chapter 15 exempts bankruptcy courts from this rule."  Objection at 8.  EWB has it precisely backwards.  The Bankruptcy Code does not contain any provision or otherwise codify any general principle barring cannabis companies from making use of American bankruptcy law.  Instead, certain bankruptcy courts have in the past relied on *specific provisions* that are found in *other* chapters of the Bankruptcy Code to, in certain instances, dismiss cases involving cannabis companies.  Those provisions are not found in chapter 15 and are incompatible with the structure of chapter 15, under which recognition is mandatory unless section 1506 applies.

50.      Those courts that have denied bankruptcy protection to cannabis companies in the past have done so on two main grounds.  First, chapter 11 of the Bankruptcy Code requires a bankruptcy court to "dismiss a case under this chapter … for cause," which includes such factors as "gross mismanagement of the estate."  11 U.S.C. § 1112(b)(1), (4)(B).  Certain bankruptcy courts have cited this provision to dismiss *chapter 11* cases involving cannabis businesses.  *See In re Basrah Custom Design, Inc.*, 600 B.R. 368, 382 (Bankr. E.D. Mich. 2019); *In re Way to Grow, Inc.*, 597 B.R. 111, 132 (Bankr. D. Colo. 2018), *aff'd*, 610 B.R. 338 (D. Colo. 2019); *In re*

*Rent-Rite Super Kegs W. Ltd.*, 484 B.R. 799, 809 (Bankr. D. Colo. 2012).[18]    Second, other bankruptcy courts have cited chapter 11 and 13's requirement that a plan be "proposed in good faith and not by any means forbidden by law," 11 U.S.C. §§ 1129(a)(3), 1325(a)(3), to dismiss cases involving cannabis businesses filed under those chapters.  *See In re Blumsack*, 657 B.R. 505, 517 (B.A.P. 1st Cir. 2024); *In re McGinnis*, 453 B.R. 770, 772 (Bankr. D. Or. 2011); *In re Rent-Rite Super Kegs W. Ltd.*, 484 B.R. 799 (Bankr. D. Colo. 2012).  Similarly, courts have expressed concern that a plan proposed by "means forbidden by law" could place a "trustee in the untenable position of knowingly administering assets derived from an activity illegal under federal criminal law." *Blumsack*, 657 B.R. at 516; *see also Way to Grow*, 597 B.R. at 120.

51.    Other bankruptcy courts, however, have held that these same provisions *do not* support dismissal of cannabis-related bankruptcies—in cases involving companies similar to the Debtors here.  As one court observed, "Congress did not adopt a 'zero tolerance' policy that requires dismissal of any bankruptcy case involving violation of the CSA (or other activity that might be proven to be illegal)." *In re Hacienda Co., LLC*, 647 B.R. 748, 754 (Bankr. C.D. Cal. 2023).  That court found that it made little sense to deny debtors access to the bankruptcy system where the debtors were not in the business of selling cannabis when they filed and did not seek to "use or invest, directly or indirectly" the proceeds of such sale, but instead sought to pay down creditors.  *Id.* at 753 (internal quotation marks omitted).  As the court explained, "passive ownership of stock, with intent to liquidate that stock to pay creditors" was "the opposite of an intent to profit from an ongoing scheme to distribute cannabis." *Id.* at 752–53.  Similarly, in *In re*

---

[18]    Courts have likewise applied *chapter 7's* and *chapter 13's* for-cause dismissal provisions to the same end. *See In re Arenas*, 535 B.R. 845, 848 (B.A.P. 10th Cir. 2015); *In re Medpoint Mgmt, LLC*, 528 B.R. 178, 186 (Bankr. D. Ariz. 2015), *vacated in part on other grounds*, 2016 WL 3251581 (B.A.P. 9th Cir. June 3, 2016); *In re Burton*, 610 B.R. 633, 639 (B.A.P. 9th Cir. 2020); *see generally* 11 U.S.C. § 707(a) (authorizing dismissal for cause), § 1307(c) (same).

*Callaway*, the court explained that, where the debtor was "separate from the entities that engage in the marijuana business," such that "the trustee is not in danger of having to administer the actual tangible marijuana assets," there was no basis to dismiss a chapter 7 case.  663 B.R. 109, 116 (Bankr. N.D. Cal. 2024).  And in *In re Unrivaled Brands, Inc.*, the bankruptcy court recently approved the disclosure statement of debtors who owned an interest in a publicly listed cannabis company, even though the disclosure statement contemplated a chapter 11 plan that would monetize shares in that company.  *See* No. 24-19127 (BB) (Bankr. C.D. Cal. Apr. 10, 2026), D.I. 340; *see also In re Pyxus Int'l, Inc.,* No. 20-11570 (LSS) (Bankr. D. Del. Aug. 21, 2020), D.I. 355 (confirming a chapter 11 plan involving a holding company debtor whose non-debtor subsidiaries were engaged in the sale of cannabis products).

52.     In any event, all of these cases are irrelevant because chapter 15 lacks the provisions that courts have relied on to dismiss cannabis bankruptcy cases filed under other chapters of the Bankruptcy Code.  Under chapter 15, recognition is *mandatory* unless the stringent standard of section 1506 is met, and the Court then uses its discretion not to recognize relief that is manifestly contrary to public policy—there is no "for cause" or "good faith" requirement.  *See In re Millard*, 501 B.R. 644, 654 (Bankr. S.D.N.Y. 2013) ("[W]hen 1517(a) says it's 'subject to' one thing—section 1506, which … is the public policy exception—that sends a message to the judiciary that *it is not subject to other things that were not so included* … such as the 'good cause' requirements, or dismissal for cause requirements, that appear in other sections of the code in chapters 7, 11 and 13.").  Moreover, because chapter 15 proceedings require American courts only to recognize a foreign proceeding and provide relief in furtherance of that proceeding, there is no risk that the court or a trustee will need to oversee the ongoing administration of an estate that implicates a cannabis business, as might be the case under other chapters of the Bankruptcy Code.

22

53. Simply put, chapter 15 is not chapter 11. There is no legitimate basis for EWB to rewrite the Bankruptcy Code and import standards from other chapters of the Bankruptcy Code into chapter 15 in an effort to "dismiss" this case. As the U.S. Supreme Court has explained, even "in exercising [its] statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions"—such as section 1517's requirement that recognition is mandatory unless section 1506 applies. *Law v. Siegel*, 571 U.S. 415, 421 (2014). Chapter 15 is designed to facilitate the importation of foreign judgments in foreign insolvency proceedings, not to allow creditors to smuggle in aspects of domestic bankruptcy contained nowhere in chapter 15's text to undermine those foreign proceedings. Because section 1506 is not implicated, this Court must grant recognition.

### III. The relief the Debtors seek is appropriate.

54. EWB next argues that applying certain relief awarded by the Canadian Court to the Parent Company's non-debtor subsidiaries "exceed[s] the authority of sections 1520 and 1521." Objection at 10. But the relief the Debtors ask this Court to enforce is relief that has already been entered by the court in the Canadian Proceeding and already granted by this Court on a provisional basis. The language EWB objects to ensures only that the Initial Order entered in the Canadian Proceeding is "given full force and effect … in the United States" "[s]olely to the extent provided … in the Initial Order." Proposed Recognition Order ¶ 8. Sustaining EWB's objection would therefore allow EWB to violate an order of a foreign court—even though EWB participated in the foreign proceeding, did not object to this relief when it was awarded in that proceeding (despite having notice of the hearing at which it was granted and participating with counsel in the Canadian Proceeding), and still retains the right to seek relief in the foreign forum.[19]

---

[19] *See* Supplemental Nicholson Declaration ¶¶ 5–6.

55.   The relief to which EWB objects also is perfectly appropriate and consistent with relief that has been awarded in other similar cases by this Court and others.  And this relief is needed:  As discussed below, EWB has already *repeatedly violated* the stay entered in the Canadian Proceeding, in violation both of that court's order and *this Court*'s order granting provisional relief, threatening the success of this cross-border case.  *See infra*, at 31–32.  Further violations of the stay risk disrupting the reorganization process to the detriment of *all* creditors— especially because the creditors of the subsidiaries protected by the stay are the same as the creditors of the Debtors, and so any harm to these subsidiaries will necessarily redound to the detriment of the Debtors' creditors.

56.   At the outset, this Court held that the relief the Debtors seek is appropriate on a provisional basis by overruling the U.S. Trustee's objection on this issue.  As this Court explained, such orders are "squarely within well-established practice in this jurisdiction and in others."  Mar. 26, 2026 Hearing Tr. at 31:17–18, D.I. 39.[20]

57.   EWB fails to offer any good reason why this Court cannot or should not extend this same relief upon recognition.  Section 1521(a) provides that, "[u]pon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, *grant any appropriate relief*."  11 U.S.C. § 1521(a) (emphasis added).  Such relief "includ[es]" "extending relief granted under section 1519(a)" on a provisional basis, and "granting any additional relief that may be available to a trustee."  11 U.S.C. § 1521(a)(6), (7).  All the Debtors ask the Court to do is to extend the provisional relief this Court

---

[20]   *See Motion for Provisional Relief Pursuant to Section 1519 of Bankruptcy Code*, D.I. 3, at 22 n.7 (collecting cases).

already found is appropriate, and which the Canadian Court has already granted and found appropriate.[21]

58.    "Bankruptcy Courts are afforded broad discretion to grant relief to third parties in the interest of comity and foreign cooperation," and such "relief is regularly granted in parallel to relief granted in the recognized foreign proceeding." *In re Asbestos Corp. Ltd.*, 674 B.R. 855, 868–69 (Bankr. S.D.N.Y. 2025). In accordance with these principles, this Court has regularly entered recognition orders enforcing stays granted under Canadian proceedings, including stays extending to non-debtors. *See, e.g.*, *In re Pride Group Holdings Inc.*, No. 24-10632 (CTG) (Bankr. D. Del. May 2, 2024), D.I. 152 (recognition order mirrored Canadian order by extending relief to the Debtors, "together with their non-Debtor affiliates"); *In re SimEx Inc*., No. 24-10083 (TMH) (Bankr. D. Del. Feb. 20, 2024), D.I. 39 (Canadian stay extended to directors and officers, which was given full force and effect by the U.S. bankruptcy court); *In re Nexii Building Sols. Inc*., No. 24-10026 (JKS) (Bankr. D. Del. Feb. 9, 2024), D.I. 44 (same); *In re Lighthouse Immersive Inc*., No. 23-11021 (LSS) (Bankr. D. Del. Aug. 28, 2023), D.I. 20 (same); *In re NextPoint Fin. Inc*., No. 23-10983 (TMH) (Bankr. D. Del. Aug. 16, 2023), D.I. 54 (same); *In re IMV Inc*., No. 23-10589 (KBO) (Bankr. D. Del. June 2, 2023), D.I. 29 (same); *In re Essar Steel Algoma Inc.*, No. 15-12271 (BLS) (Bankr. D. Del. Dec. 1, 2015), D.I. 97; *see also Asbestos Corp.*, 674 B.R. at 874–76; *In re Sandvine Corp.*, No. 24-33617 (SGJ) (Bankr. N.D. Tex. Nov. 7, 2024), D.I. 26 (granting preliminary injunction to non-debtor affiliates).

---

[21]    EWB argues that the Recognition Order would exceed the scope of the Initial Order if it authorized non-debtor entities to decline to pay rent to EWB. *See* Objection at 15. But the Proposed Recognition Order is cabined to the scope of the Initial Order, so there is no risk that the relief the Debtors seek would exceed the scope of that order. To the extent the Initial Order contemplates that lessees will continue to pay rent, the Proposed Recognition Order does not provide otherwise.

59.     These cases refute EWB's suggestion that relief granted under section 1521 cannot extend to non-debtor affiliates.  *See* Objection at 10–12.  EWB cites no authority to support its position.  Instead, EWB argues that because section 1520 automatically applies "'with respect to the debtor and the property of the debtor,'" and because section 1521(a)(1) expressly mentions "'the debtor's assets, rights, obligations or liabilities,'" it follows that chapter 15 "draws a deliberate line between debtors and non-debtors."  Objection at 10.  But the entire purpose of section 1521 is to provide courts discretion to grant relief that is *broader* than the automatic relief granted in section 1520 in order to facilitate foreign proceedings.  It is not intended to hamstring the Court's authority to enforce relief already awarded by a foreign court.  While EWB is correct that section 1521(a)(1) expressly references the debtor's property, that provision is simply one enumerated example of appropriate relief under a provision that expressly authorizes the court to "grant *any* appropriate relief."  11 U.S.C. § 1521(a) (emphasis added).

60.     Section 1521 "explicitly grants broad judicial discretion, including the ability to enforce the terms of a foreign restructuring plan."  *Crédito Real*, 2026 WL 881444, at *6; *see also Odebrecht*, 669 B.R. at 465 ("The discretion that is granted is exceedingly broad since a court may grant any appropriate relief that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors." (citations omitted)).  To the extent that relief has been awarded by a foreign court, an objector must meet a high burden to overcome the comity interest in enforcing orders entered in the foreign proceeding.  As the District Court put it in *Crédito Real*: "[W]hile courts are not obligated to grant every request made by a foreign representative, they are required to weigh whether recognition and enforcement of foreign relief advances the cooperative and efficiency-based goals of Chapter 15.  Comity is a guiding statutory principle."  2026 WL 881444, at *8.  Accordingly, "refusing to recognize customary foreign

26

restructuring tools … absent any fundamental conflict with U.S. policy, would frustrate the statutory purpose of Chapter 15." *Id.*

61.    EWB also suggests that section 1522, which requires that "the interests of the creditors and other interested entities … [be] sufficiently protected," bars the proposed relief here. *See* Objection at 11.  Again, EWB cites no authority for this proposition.  EWB's argument misunderstands the role of section 1522, which is designed simply to ensure that claimants are treated fairly and justly.  As courts have explained, "[s]ufficient protection is embodied by 'three basic principles: the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the foreign proceeding, and the distribution of proceeds of the foreign estate substantially in accordance with the order prescribed by U.S. law.'"  *Asbestos Corp.*, 674 B.R. at 869 (quoting *Odebrecht*, 669 B.R. at 474).  EWB does not argue that the Canadian Proceeding lacks any of these protections.  EWB has opportunities to object to stay extensions in the Canadian Proceeding and is afforded all due process in such proceeding.  Notably, EWB did not object to the Initial Order in the Canadian Proceeding despite having the opportunity to do so.  Indeed, the relief requested (recognition of a short-term stay for approximately three more weeks, and a continued stay as may be approved by the Canadian Court) is extremely modest in comparison with other relief recognized by U.S. bankruptcy courts.

62.    Notably, courts have held that section 1522 does not bar orders recognizing third-party releases.  As those courts have explained, section 1522 is consistent with such releases provided that the plan "enables the just treatment of all claimants," *Odebrecht*, 669 B.R. at 474, and the foreign proceeding is "procedural[ly] and fundamental[ly] fai[r]" and gives creditors "notice and opportunity to be heard."  *Crédito Real*, 2026 WL 881444, at \*7.  It would be

anomalous for chapter 15 relief to authorize third-party releases, which are *not* permitted under other chapters of the Bankruptcy Code, yet to prohibit a stay that extends to non-debtor affiliates, which is permissible under the Bankruptcy Code.

63.    Section 1522 is intended to ensure only that creditors are not treated unfairly in the foreign proceeding, not to give creditors a right to circumvent the foreign proceeding and flout comity where they do not like the substantive result under foreign law.  Indeed, EWB's construction of section 1522 would undermine the narrow limits of section 1506, by allowing courts to deny relief necessary to assist in a foreign proceeding, even where such relief is consistent with public policy, and even where creditors are justly treated.  This interpretation would undermine chapter 15 as a whole, by allowing creditors like EWB to collaterally challenge foreign judgments in American courts, even when there is no barrier to objecting in the foreign forum.

64.    Even if this Court could not grant relief under section 1521(a), relief would still be appropriate under section 1507, which authorizes a court to provide "additional assistance to a foreign representative" upon granting recognition, provided that "such additional assistance, consistent with the principles of comity, will reasonably assure" just treatment of creditors, and protection of creditors against prejudice and inconvenience, among other factors.  11 U.S.C. § 1507.  This inquiry "focus[es] on whether there is a 'full and fair trial before a court of competent jurisdiction that was conducted under a system of jurisprudence likely to secure an impartial administration of justice and there is nothing to show either prejudice in the court, or in the system of laws under which it presides.'"  *Crédito Real*, 2026 WL 881444, at *8 (citation omitted).  EWB does not argue that the Canadian Proceeding would fall short of these requirements.

65.    The only rationale EWB provides as to why section 1507 should not apply is that doing so would be inconsistent with the principles of comity because the relief awarded

28

would "violat[e] federal law." Objection at 17. This argument makes little sense. Given that section 1506 does not apply, recognition is mandatory under section 1517. EWB cannot circumvent the narrow scope of section 1506 by invoking the Controlled Substances Act to bar specific relief under section 1507. The cases cited by EWB do not support this proposition.[22] On the contrary, section 1507 provides courts with "broad discretion to recognize and assist foreign proceedings, even when the relief exceeds what is typically available under Chapter 11, so long as basic principles of comity, fairness, and U.S. public policy are respected." *Crédito Real*, 2026 WL 881444, at *7. This provision is applicable even when the relief provided in the foreign proceeding differs from permissible domestic relief; and "even the absence of certain procedural or constitutional rights will not itself be a bar." *In re OAS, S.A.*, 533 B.R. 83, 104 (Bankr. S.D.N.Y. 2015); *see also Metcalfe*, 421 B.R. at 697 (approving "non-debtor release and injunction provisions included in … Canadian Orders" under section 1507 because they "treat all claimants in the Canadian Proceedings similarly").

66.    As a final matter, EWB argues that this Court cannot grant relief without assessing whether non-debtor affiliates would be likely to prevail in defending against creditor suits, and that "irreparable harm" is defeated whenever debtors could defend an action on behalf of non-debtor affiliates. *See* Objection at 13. That is wrong. Courts may "gran[t] extensions of a stay to a non-debtor" provided that "'a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.'" *Asbestos Corp.*, 674 B.R. at 869, 874

---

[22]    *See In re Global Cord Blood Corp.*, No. 22-11347 (DSJ), 2022 WL 17478530, at *1 (Bankr. S.D.N.Y. Dec. 5, 2022) (denying chapter 15 recognition to a Cayman Islands proceeding that "does not satisfy the Bankruptcy Code's definition of a 'foreign proceeding'" and was "most akin to a corporate governance and fraud remediation effort"); *In re Basis Yield Alpha Fund*, 381 B.R. 37, 40, 55 (Bankr. S.D.N.Y. 2008) (concluding that an evidentiary hearing was warranted to determine whether there was a foreign main or nonmain proceeding); *In re Bancredit Cayman Ltd.*, No. 06-11026 (SMB), 2007 WL 3254369, at *2 (Bankr. S.D.N.Y. Nov. 2, 2007), *aff'd*, 2008 WL 919533 (S.D.N.Y. Mar. 31, 2008) (refusing to grant relief to a foreign representative without providing notice to affected parties).

(citation omitted). This is satisfied where there is "a high likelihood of prejudice" to the debtor "if U.S. litigation were able to continue against" the non-debtors. *Id.* at 875. This mirrors the inquiry outside chapter 15: when courts have considered whether to "grant a preliminary injunction staying claims against non-debtors," they have understood the "'elements of probable success on the merits and irreparable harm'" to require an inquiry as to "'whether the debtor would be seriously adversely affected if the benefit of the automatic stay is not extended'" to litigation against affiliates. *In re Parlement Techs., Inc.*, 661 B.R. 722, 726–27 (Bankr. D. Del. 2024) (quoting *In re Am. Film Techs., Inc.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994)). The Third Circuit, for instance, has explained that the "standard for the grant of a stay is generally whether the litigation 'could interfere with the reorganization of the debtor.'" *In re W.R. Grace & Co.*, 115 F. App'x 565, 570 (3d Cir. 2004) (quoting *In re A.H. Robins Co.*, 828 F.2d 1023, 1025 (4th Cir. 1987)).

67. Here, as the Canadian Court expressly found, "[p]rotection of the Subsidiaries is critical to the success of the Applicants' restructuring efforts and these CCAA Proceedings," and "extending the Stay to the Subsidiaries will also mitigate against the risk of uncoordinated enforcement attempts in different jurisdictions, all of which would be counterproductive to the maximization and protection of value for the Company and its stakeholders"—confirming not just that the Debtors are likely to succeed on the merits, but also why the equities and the public interest favor the relief the Debtors seek. *Motion for Provisional Relief Pursuant to Section 1519 of Bankruptcy Code*, D.I. 3, at 13. The stay is particularly necessary with respect to EWB. EWB is highly integrated in the CC Group's business. The CC Group holds over 20 accounts with EWB (the "**EWB Accounts**"), on which CC Group stores rely in order to pay certain of their employees, regulatory fees, and vendors. Supplemental CRO Declaration ¶ 5. Continued access to and use of the EWB Accounts is critical to the ongoing

30

operation of the CC Group's business and the CC Group's sale process, which is necessary to maximize value for the Debtors' creditors, including senior secured noteholders, EWB, and others. *Id.* If EWB were allowed to take enforcement action that disrupted the cash management system, such as freezing the accounts (which it has done before) or sweeping cash from the EWB Accounts, this could grind the CC Group's business to a halt and hinder the sales process. *See id.* ¶¶ 6, 15–16.

68.     Further, the New Jersey and Maryland properties are cultivation facilities that are integral to going concern operations in these markets, which the CC Group is in active negotiations to sell. If EWB exercises remedies against these properties it could jeopardize the sales process for these markets. *See id.* ¶¶ 15–16. As for EWB's suggestion that its collateral is at risk of forfeiture, EWB identifies no basis to believe that the Department of Justice will depart from its longstanding policy of non-enforcement. And EWB's history of issuing loans to cannabis businesses makes clear that EWB itself does not view this as a serious risk. Furthermore, EWB's suggestion that the balance of equities weighs against relief is particularly implausible given that each of the three properties in question has a corresponding reserve account holding four-to-six months' worth of principal and interest. *See id.* ¶ 9.

69.     The Canadian Court's analysis was correct and there is no basis for this Court to disrupt that conclusion and deny relief the Canadian Court rightly viewed as "critical" to the Debtors' restructuring. *See Motion for Provisional Relief Pursuant to Section 1519 of Bankruptcy Code*, D.I. 3, at 13. If anything, EWB's actions during the pendency of this proceeding heighten the need for this relief: EWB has *repeatedly violated* the stay entered in the Canadian Proceeding and this Court's order granting provisional relief. *See* Supplemental CRO Declaration ¶ 10. First, on March 26, 2026, two days after the Initial Order was entered, and on the same day

31

as this Court's order granting provisional relief, EWB froze all bank accounts associated with the Debtors and the non-debtor subsidiaries. *Id.* ¶ 11.  Then, approximately three weeks later, on April 17, 2026, EWB *again* froze the Debtors' deposit accounts. *Id.* ¶ 12.  These repeated violations of the stay have already impaired the Debtors' operations and future violations would likely derail the ability to consummate going-concern sales. *Id.* ¶¶ 14–16.[23]

### **CONCLUSION**

70.    For the foregoing reasons, this Court should overrule EWB's objection and grant the Recognition Motion and grant all appropriate relief.

Dated: May 8, 2026
      Wilmington, Delaware

/s/  *Zachary I. Shapiro*

RICHARDS, LAYTON & FINGER, P.A.
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
Zachary J. Javorsky (No. 7069)
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Email: shapiro@rlf.com
       schlauch@rlf.com
       javorsky@rlf.com
-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Email: davidj.cohen@weil.com

-and-

---

[23]  EWB suggests that injunctive relief should not apply to the New York property. *See* Objection at 14.  But the proper course is for EWB to seek tailored relief from the stay in the Canadian Court, as is permitted by the Initial Order—not to undermine the Initial Order as a whole with respect to all creditors.

WEIL, GOTSHAL & MANGES LLP
Garrett A. Fail (admitted *pro hac vice*)
Robert B. Niles-Weed (admitted *pro hac vice*)
Alexander P. Cohen (admitted *pro hac vice*)
Andrew J. Clarke (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: garrett.fail@weil.com
         robert.niles-weed@weil.com
         alexander.cohen@weil.com
         andrew.clarke@weil.com

*Attorneys for the Foreign Representative*